# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

OPTUMRX PBM OF ILLINOIS, INC.
and OPTUMRX, INC.

      Petitioners,                        Case No. 3:23-cv-1308-TJC-PDB

v.

UNITED NETWORKS OF AMERICA,
INC.,

      Respondent.

_____

## AMENDED PETITION TO VACATE ARBITRATION AWARD

Petitioners OptumRx PBM of Illinois, Inc. and OptumRx, Inc. ("Petitioners" or "Catamaran") file this Amended Petition to Vacate Arbitration Award and Incorporated Memorandum of Law under 28 U.S.C. § 1332 and 9 U.S.C. § 10.

## PRELIMINARY STATEMENT

1.     This Petition seeks to vacate an arbitration award issued on October 5, 2023 (the "Award") that requires Catamaran to pay over $48 million in damages.

2.     The underlying dispute concerns an agreement between Catamaran and Respondent United Networks of America ("UNA") related to prescription-drug discount cards (the "2013 Agreement"). Under the agreement, Catamaran paid UNA a ▇▇▇ commission when a customer used UNA's discount prescription card—a

favorable rate that exceeded the rates in earlier contracts between the parties. The $███ commission could apply to discount card programs UNA acquired or created while the 2013 Agreement was in effect if UNA complied with certain contractual disclosure and administrative requirements.

3.    Just eight days after the agreement was signed, UNA wrote to Catamaran claiming it had "acquired" a third-party discount card provider, National Benefits Builders, Inc. ("NBBI"), and thus directed Catamaran to pay the $███ commission for claims originating from NBBI's business as well as UNA's. Catamaran suspected foul play. UNA never mentioned negotiations with NBBI, UNA did not have the financial resources to buy NBBI, and it was inconceivable that UNA initiated and consummated the alleged acquisition in less than eight days. UNA also refused to provide documentary evidence of a genuine acquisition, thus confirming Catamaran's suspicions and causing Catamaran to terminate its agreement with UNA in January 2014, just weeks after it was signed.

4.    UNA commenced arbitration in May 2016 to compel Catamaran to pay UNA the favorable $███ rate for claims originating with NBBI, among other claims. Throughout the arbitration, Catamaran suspected—and sought to establish—that UNA had been negotiating its purported acquisition of NBBI before the 2013 Agreement was executed and that UNA did not actually acquire NBBI. UNA's shifting story ultimately unraveled weeks before the June 2023 hearing when it

became clear for the first time that UNA and NBBI had likely backdated their agreement and then worked together to conceal evidence of that backdating from Catamaran and the arbitrator.

5.    Catamaran was unable to fully challenge UNA's misrepresentations that it signed the UNA/NBBI agreement in December 2013 because Catamaran first learned of the backdating in the final run-up to the merits hearing.  Additionally, after Catamaran learned of the backdating, UNA stonewalled Catamaran's attempts to question UNA's witnesses and discover additional documents related to the backdating.

6.    The arbitrator issued the Award on October 5, 2023.  He found that Catamaran had not proven UNA committed fraud in negotiating the 2013 Agreement. But he also found that UNA failed to prove that it acquired NBBI while the 2013 Agreement—the agreement under which UNA sought relief—was in effect.  That state of equipoise should have caused the arbitrator to find that UNA failed to prove its claims and was entitled to nothing.

7.    Instead, based on their conduct, the arbitrator found that UNA acquired NBBI at least by January 2015.  He then found Catamaran liable for over $30 million in damages under a *different* contract that Catamaran and UNA signed in 2005.  The 2005 contract, which does not contain an arbitration clause, was never presented to the arbitrator as a potential ground for liability.  The parties were never afforded an

opportunity to brief the validity of the 2005 contract, let alone whether Catamaran breached it or was liable for damages as a result. The arbitrator therefore exceeded the scope of his authority and also denied the parties a fair opportunity to present their case regarding Petitioner's purported liability under that 2005 contract.

8.    To the extent relief was awarded to UNA, the Award should be vacated because it was procured by fraud. Alternatively, the Award should be partially vacated because it orders Catamaran to pay damages for breaching a contract that was not before the arbitrator as a potential basis for liability and which the parties therefore did not have an opportunity to address.[1]

## **PARTIES**

9.    Petitioner OptumRx PBM of Illinois, Inc. ("Optum PBM") is a Delaware corporation with its principal place of business in Minnesota. Optum PBM is the successor in interest to Catamaran PBM of Colorado, LLC, a respondent in the arbitration, which was a Delaware corporation with its principal place of business in Illinois.

10.    Petitioner OptumRx, Inc. ("OptumRx") is a California corporation with its principal place of business in Eden Prairie, Minnesota.

11.    Respondent United Networks of America, Inc. is a Louisiana corporation with its principal place of business in Baton Rouge, Louisiana.

---

[1] The Award is attached as Exhibit 1 to the Declaration of Michael Holecek. ECF No. 11-1.

## JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction over this Petition under 28 U.S.C. § 1332, as there is diversity of citizenship between Petitioners and Respondent, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Petitioners timely filed and served their original Petition and this Amended Petition on Respondent within three months of October 5, 2023, the date the Award was issued and delivered to the parties.  9 U.S.C. § 12.

13.    Venue is proper in this District under 9 U.S.C. § 10 as the underlying arbitral Award was made in Amelia Island, Nassau County, Florida.

## FACTS

### A.    Overview of the Parties' Businesses

14.    Catamaran provides pharmacy benefit management and medical recordkeeping services to third party payors and health plan sponsors.[2]  Catamaran maintains a network of pharmacies that have agreed to provide discounts on prescription drugs for Catamaran's clients.  Catamaran works with third parties that engage directly with consumers and encourage those consumers to save money on prescription drugs by presenting discount cards when purchasing medications at retail pharmacies.

---

[2] At all times relevant to this Petition, Catamaran PBM of Colorado, LLC was the primary entity responsible for transacting with UNA.  Accordingly, this Petition refers to Petitioners collectively as "Catamaran."

15.    UNA is one such third party that administers a discount card program. UNA provides discount cards to consumers who can then take advantage of reduced drug prices negotiated by Catamaran.  Generally speaking, UNA earns a commission when its customers use a UNA discount card to obtain discounted drugs from a participating pharmacy.

16.    NBBI also administers a discount card program.  NBBI has held itself out as a competitor of UNA in the discount card industry, but the two companies maintain a friendly relationship and collaborate in business dealings.  UNA claims it acquired NBBI's discount card program business in December 2013.

**B.    The 2013 Catamaran-UNA Agreement**

17.    In late 2013, Catamaran and UNA negotiated the 2013 Agreement, under which Catamaran agreed to pay UNA a $▮ commission for qualifying claims submitted by UNA.  *See* ECF No. 11-2 at 1, 23.  The $▮ commission in the 2013 Agreement was an extremely favorable rate for UNA, and it represented an increase of between 10% and 50% over rates in earlier agreements between the parties.

18.    The 2013 Agreement also stated Catamaran would extend the favorable $▮ commission to new discount card programs that UNA created or acquired while the 2013 Agreement was in effect if UNA met all of the prerequisites to bring the additional discount card programs within the 2013 Agreement's terms.

**C.    UNA Announces a Discount Card "Acquisition" Immediately After Signing the 2013 Agreement, and Catamaran Suspects Fraud**

19.    The 2013 Agreement was executed on December 10, 2013.  Just eight days later, on December 18, 2013, UNA notified Catamaran that it had purportedly acquired the discount card program operated by NBBI, who already had a separate and exclusive contract with Catamaran under which Catamaran was obligated to pay $███ per commissionable claim to NBBI.  *See* ECF No. 11-1 at 26.

20.    Catamaran suspected that UNA and NBBI had been negotiating their alleged agreement at the same time UNA and Catamaran negotiated the 2013 Agreement.  In addition, Catamaran suspected that the alleged "acquisition" was a sham—a fraudulent attempt by UNA and NBBI to obtain the higher and preferable $███ commission for a broader book of business that they would not be able to obtain through legitimate negotiations with Catamaran.

21.    Confirming Catamaran's suspicions, UNA refused to provide proof of its supposed acquisition of NBBI's discount card business.  Catamaran lost trust in UNA and had no choice but to terminate the 2013 Agreement on January 7, 2014. *See* ECF No. 11-1 at 25.  That termination became effective sixty days later on March 8, 2014.

**D.    UNA Provides Doctored Evidence of the Purported Acquisition**

22.    In two years of pre-dispute negotiations, UNA only ever provided Catamaran with the title page, signature page, and a heavily redacted page 3 of the

UNA/NBBI agreement. None of the material terms were provided, and it was therefore impossible to confirm the legitimacy of UNA's purported acquisition of NBBI, or when the supposed "acquisition" allegedly occurred.

23.    It was not until well into discovery that Catamaran ever saw a full copy of the alleged agreement between UNA and NBBI. But still, UNA fraudulently concealed evidence demonstrating the true date UNA and NBBI signed their agreement. That concealment went directly to the key issue in the arbitration. *See* ECF No. 11-1 at 25 ("The key question then is when did UNA acquire NBBI?"). But for UNA's fraudulent conduct, the arbitration could have been avoided altogether, or at least would have concluded years earlier with an award against UNA and in favor of Catamaran. *See id.* at 8–9 ("[T]he original documents . . . were perhaps the key pieces of evidence in determining the nature and timing of the relationship between UNA and NBBI and if they were made available prior to the Final Hearing, or even better, in January 201[4], the basis for this dispute would likely have been resolved prior to this Claim being filed.").

## E.    Determined to Bring the NBBI Claims Under the 2013 Agreement, UNA Initiates Arbitration Against Catamaran

24.    On May 25, 2016, UNA commenced arbitration with the American Health Lawyers Association, asserting, *inter alia*, that Catamaran was required to pay UNA $███ for each claim processed under the NBBI discount card program that UNA purportedly had acquired in December 2013. ECF No. 11-3 at 4.

25.    Catamaran responded that the 2013 Agreement was invalid because it had been procured by UNA's fraud.  ECF No. 11-1 at 1, 17–18.  Catamaran also denied liability to UNA for commissions on any NBBI claims, on the ground that UNA provided insufficient proof that it had validly acquired NBBI.  *Id.* at 23.

26.    UNA's fraud began to unravel at the February 17, 2023 deposition of its chairman, Mr. Jumonville.  Jumonville testified that both he and Raymond Marszalowicz, an owner of NBBI, remembered that Marszalowicz was on his honeymoon when he signed the UNA/NBBI agreement.  ECF No. 11-7 at 16–19.  But Catamaran's investigation revealed that Marszalowicz was married on July 5, 2014, more than seven months after UNA claimed to have executed the agreement with NBBI, *id.,* and only two weeks before UNA provided the redacted copy of the UNA/NNBI agreement to Catamaran on July 16, 2014.

27.    Jumonville also testified that he used an online template to create the UNA/NBBI agreement, and it soon became clear that the template originated from the website LawDepot.com.  Thus, in April 2023, Catamaran subpoenaed records from Sequitur, Inc., which owns LawDepot.com.  Just 14 minutes after Catamaran notified UNA of the subpoena, UNA produced a record showing that, on July 16, 2014, seven months after the purported acquisition, and just 45 minutes after Catamaran requested a copy of the acquisition agreement from UNA in pre-dispute negotiations, UNA's Chief Legal Officer visited LawDepot.com and downloaded

the template which closely mirrors the UNA/NBBI agreement. Those damning facts confirmed UNA likely backdated the UNA/NBBI agreement produced in the arbitration. ECF No. 11-7 at 16.

28.    Suddenly aware of the possibility that the UNA/NBBI agreement was backdated and with the merits hearing rapidly approaching, Catamaran re-reviewed UNA and NBBI's productions to see if there was any documentary proof that the UNA/NBBI agreement existed before July 2014. There was not. Not a single email attached, quoted, named, or cited a paragraph of the UNA/NBBI agreement by name or number.

29.    Catamaran also realized that NBBI's production of email correspondence terminated in June 2014. That fact had gone unnoticed because it was irrelevant until UNA's backdating scheme was uncovered. Catamaran sought to remedy this by requesting additional documents from UNA. But UNA refused to produce additional documents confirming the date on which the UNA/NBBI agreement was signed.

30.    Based on UNA's misconduct, Catamaran filed a Motion for Sanctions against UNA on June 12, 2023, the day the merits hearing began. ECF No. 11-1 at 8. That motion explained that UNA's case was a sham, and that UNA's years-long concealment of its fraud on the arbitration prevented Catamaran from seeking additional evidence of UNA's backdating scheme before the June 2023 hearing,

which the arbitrator indicated he would not adjourn.

31.    In the Award, the arbitrator acknowledged that UNA did not provide a "satisfactory explanation" as to why it did not produce evidence to support its alleged acquisition of NBBI's discount card program, but he nevertheless denied Catamaran's sanctions motion on the grounds that no direct evidence confirmed UNA intentionally destroyed or concealed evidence.  *Id*. at 8–9.

**F.    The Award**

32.    The arbitrator issued the Award on October 5, 2023.  He found there was insufficient evidence to determine that UNA fraudulently induced Catamaran into executing the 2013 Agreement by concealing its alleged negotiations with NBBI. *Id.* at 19.  Thus, the arbitrator found that the 2013 Agreement between Catamaran and UNA was valid as of December 10, 2013.  *See id*.

33.    On the other hand, the arbitrator found that "UNA did not definitively prove the existence of a purchase of the NBBI Book" before the 2013 Agreement terminated.  *Id.* at 22.  With respect to UNA's demand for payment for the NBBI [claims] at the rates in the 2013 Agreement, the arbitrator found "at least a credible question of facts regarding the purported NBBI Purchase Agreement . . . ."  *Id.* at 26.

34.    Accordingly, because any acquisition of NBBI occurred after the 2013 Agreement's termination, the arbitrator found that transactions originating from NBBI's book of business were not covered by the 2013 Agreement.  That should

have been the end of the matter with respect to UNA's demand for contract damages related to NBBI's book of business.

35.    But the arbitrator inexplicably went on to award UNA damages based on a different contract that was **not** before the arbitrator and **did not** include an arbitration clause.  The arbitrator started down that road by suggesting "we must still account for the NBBI claims" and that "one or the other (UNA or NBBI) is due payment" because "Catamaran processed these claims and made revenue." *Id.* at 26.

36.    The arbitrator then went in search of a contract upon which to award money to UNA based on the NBBI claims.  He landed on a 2005 contract between Catamaran and UNA, called the "Health Trans Retail Sponsor Agreement" (the "2005 Health Trans Contract").  *Id.*  The 2005 Health Trans Contract had previously governed UNA's relationship with Catamaran, which was formerly known as Health Tran, LLC.  *See* ECF No. 11-4.  The 2005 Health Trans Contract required Catamaran to pay UNA a ▮▮▮▮ commission for each qualifying claim.  ECF No. 11-1 at 26.

37.    Although the arbitrator recognized that the 2005 Health Trans Contract did not govern the parties' relationship while the 2013 Agreement was in effect, he found that the 2005 Health Trans Contract had somehow been resuscitated when the 2013 Agreement was terminated in March 2014, such that "UNA, as the owner of the NBBI claims at least by January 2015," was "entitled" to payment at the rate of $▮▮▮ for each NBBI claim submitted since January 2015.  *Id.* at 26–27.  He therefore

awarded UNA damages of $30,999,892 under the 2005 Health Trans Contract.  *Id*.

38.    But disputes under the 2005 Health Trans Contract are not arbitrable; they are subject to the "exclusive jurisdiction of the courts within the State of Colorado."  ECF No. 11-4 at § XV(I).  Accordingly, the arbitrator had no authority to award damages in connection with UNA's alleged "entitle[ments]" under the 2005 Health Trans Contract.  Those claims properly belong in a court located in Colorado.

39.    Additionally, the parties neither briefed nor otherwise addressed Catamaran's alleged liability to UNA under the 2005 Health Trans Contract. Contrary to the arbitrator's statement in the Award, ECF No. 11-1 at 26, UNA never "urged" that the 2005 Health Trans Contract remained valid or was resuscitated after the 2013 Agreement's termination.[3]  Nor did this contract have an acquisition provision that would bring NBBI claims under it.  Thus, UNA also never argued that it was contractually "entitled" to reimbursement under the 2005 Health Trans Contract.

40.    To the contrary, as an alternative to its claim for contract damages under the 2013 Agreement, UNA asserted claims for *quantum meruit* and unjust enrichment, on which it sought payment for the NBBI claims "based on the market

---

[3] In fact, the 2013 Agreement had a runout provision that continues until claims fall below 1,000 per month.

and fair value owed for all such Claims." ECF No. 11-5, ¶ 115; *see also* ECF No.

11-6, ¶¶ 354–64. Those claims necessarily assume the absence of a governing

contract. Accordingly, the parties did not address whether the 2005 Health Trans

Contract sprang back to life following the 2013 Agreement's termination, much less

Catamaran's potential liability for payments under that contract.[4]

## **MEMORANDUM OF LAW**

### A.    **Argument**

The Federal Arbitration Act ("FAA") provides that a "United States court . . .

may make an order vacating the award" "where the award was produced by

corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1); "where the arbitrators were

guilty of misconduct . . . or of any other misbehavior by which the rights of any party

have been prejudiced," 9 U.S.C. § 10(a)(3); or "where the arbitrators exceeded their

powers . . . ." 9 U.S.C. § 10(a)(4).

This Court should vacate the Award for three independent reasons: (1) the

Award was procured by fraud or undue means; (2) the arbitrator exceeded the scope

of his powers by relying on the 2005 Health Trans Contract to award damages to

UNA; and (3) the arbitrator committed misconduct by introducing and relying on

---

[4] Catamaran raised the 2005 Health Trans Contract in the arbitration only to show that, *before* the execution of the 2013 Agreement, UNA was bound by the 2005 Health Trans Contract to disclose any accounts that UNA bid on, such as the NBBI account, and thus fraudulently induced Catamaran into signing the 2013 Agreement by concealing its negotiations with NBBI. ECF No. 11-7 at 13. But at no time did Catamaran (or UNA) argue that the 2005 Health Trans Contract provided a contractual basis for awarding damages on the NBBI claims.

the 2005 Health Trans Contract as a basis for liability and damages for the first time in the Award, thus depriving the parties of the opportunity to present their case on the issue.

      **1.**    **The Award Should Be Vacated Because It Was Procured By Fraud.**

Courts in the Eleventh Circuit find that an arbitration award has been procured by fraud, and should thus be vacated, where three elements are satisfied.  First, the fraud must be established by "clear and convincing evidence."  *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988).  Second, "the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration."  *Id*.  Third, the fraud must have "materially related to an issue in the arbitration."  *Id*.  The standard to determine materiality is forgiving; a movant "need not demonstrate that the arbitrator would have reached a different result" but for the fraudulent conduct.  *France v. Bernstein*, 43 F.4th 367, 381 (3d Cir. 2022).

Arbitration awards must be vacated where all these elements exist.  For example, in *Bonar*, the Eleventh Circuit reversed the district court's confirmation of an arbitration award that relied on evidence from an expert who was later discovered to have perjured himself regarding his qualifications.  835 F.2d at 1385.  The expert likely would not have been permitted to testify absent his perjury, and the expert's identity was only revealed at the hearing, thus depriving the parties of the ability to know the extent of the expert's perjury during the hearing.  *Id.* at 1384.

15

In *France v. Bernstein*, the Third Circuit held that "obtaining an award by perjured testimony constitutes fraud" and, "at least for purposes of § 10(a)(1) of the FAA, knowingly concealing evidence is analogous to perjured testimony." 43 F.4th at 378 (quotations and citations omitted). In *France*, it was revealed after the arbitration that a key witness "lied under oath and withheld important information demanded in discovery." *Id.* at 378, 381. Thus, the Third Circuit reversed the district court's confirmation of the award and remanded with an order to vacate. *Id.* at 382.

Similarly, in *MidAmerican Energy Co. v. International Brotherhood of Electrical Workers Local 499*, the arbitrator found in favor of an employee who was terminated for leaving his security post because the employee originally testified that he left his post because his wife called to inform him his son was missing. 345 F.3d 616, 618 (8th Cir. 2003). Post-award, however, evidence surfaced that the employee left his post to engage in an extramarital affair—not to attend to pressing family matters. *Id.* at 619. The Eight Circuit remanded the case to the district court for a trial to determine whether the employee's testimony was indeed false, in which case the award should be vacated because it was procured by fraud. *Id.* at 623.

Finally, in *Sorghum Investment Holdings Ltd. v. China Commercial Credit, Inc.*, No. 655372/2018, 2019 WL 1992275 (N.Y. Sup. Ct. May 6, 2019), the New York Supreme Court vacated an award under the FAA where post-award discovery

revealed testimony that contradicted the evidence relied upon in the award. The New York Supreme Court found that a witness's statements that omitted material facts were "critical in [the arbitrator's] findings" and thus "require[d] vacatur of her decision as the Award was procured by fraud or undue means." *Id*. at *3.

Vacatur is similarly appropriate here. First, Catamaran expects that limited, tailored discovery from UNA and NBBI will show by clear and convincing evidence that the UNA/NBBI agreement was signed shortly after UNA downloaded a template from LawDepot.com in July 2014, thereby confirming that the contract was executed **months** after UNA claimed, and then backdated to suit UNA's arguments in the arbitration. *See supra* ¶¶ 26, 31.[5] Discovery would further reveal the true nature of UNA's arrangement with NBBI—*i.e.*, whether UNA actually acquired NBBI or whether the two companies merely entered into a network access agreement in hopes of duping Catamaran into paying higher commissions than it otherwise would have for claims originating from NBBI's book of business.[6] *See supra* ¶ 24.

---

[5] Courts applying the FAA have permitted discovery to support a petition to vacate an arbitration award and in support of defenses against petitions to confirm arbitration awards. *See, e.g.*, *Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1345 (11th Cir. 2002) (finding that discovery in support of a petition to vacate is appropriate upon the presentation of prima facie evidence supporting the movant's claim, vacating district court's confirmation of arbitration award, and remanding for evidentiary hearing on existence of arbitrator conflict of interest as alleged in movant's petition to vacate); *Frere v. Orthofix, Inc.*, No. 00CIV.1968(RMB)(MHD), 2000 WL 1789041 (S.D.N.Y. Dec. 6, 2000) (court directed petitioners to serve discovery requests on Respondents limited to the issues raised in their motion to vacate).

[6] A network access agreement is an arrangement where one discount card provider contractually agrees to give another discount card provider access to its vendor agreement, independent of any acquisition. UNA and NBBI had entered into a similar network access agreement in the past

Second, Catamaran diligently attempted to discover evidence of UNA's fraud. For seven years, UNA and NBBI successfully concealed or destroyed evidence confirming the date on which the UNA/NBBI agreement was signed, and the story began to unravel only weeks before the arbitration hearing. As in *Bonar*, where the expert's identity was not disclosed until the arbitration hearing, Catamaran had limited time to investigate UNA's fraud. Still, Catamaran tried to remedy this prejudice by seeking discovery from UNA, sanctions, and an adverse inference before the start of the merits hearing on June 12, 2023. *See* ECF No. 11-1 at 8–9. The arbitrator did not rule on Catamaran's motion for sanctions until he issued the final Award, *see id.* at 8–9, by which point it was too late for Catamaran to insist upon other means by which it could test UNA's fraudulent testimony.

Third, the date on which the UNA/NBBI agreement was signed was "materially related to an issue in the arbitration." *Bonar* 835 F.2d at 1383. The arbitrator recognized in the Award that "[t]he key question" in the arbitration was "when did UNA acquire NBBI?" ECF No. 11-1 at 25. The validity and timing of the UNA/NBBI agreement was vigorously litigated because the parties' understood that it affected every aspect of the arbitration, including the parties' claims for relief and the arbitrator's assessment of witness credibility, most notably the credibility of

---

(unrelated to prescriptions) and, on information and belief, Catamaran suspects they entered into a similar arrangement here.

Ryan Jumonville, UNA's chairman and the architect of the fraud perpetrated on Catamaran before and throughout the arbitration.

### 2.    The Arbitrator Exceeded the Scope of His Powers.

"[A]rbitrators derive their authority from the scope of the contractual agreement." *Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F.2d 649, 651 (5th Cir. 1979).  Courts should vacate an arbitration award that "strays from interpretation and application of the agreement and effectively dispenses [the arbitrator's] own brand of industrial justice." *Battles v. Am. Van Lines, Inc.*, No. 15-cv-62247-BLOOM/Valle, 2016 WL 1258597, at *7 (S.D. Fla. Mar. 31, 2016). When an award "does not draw its essence from the contract" that provided for arbitration, "the reviewing court need not defer to the arbitrator's conclusions." *Interstate Brands Corp. v. Loc. 441 Retail, Wholesale & Dep't Store Union, AFL-CIO*, 39 F.3d 1159, 1162 (11th Cir. 1994) (internal quotations omitted).  "[A]n arbitrator cannot shield himself from judicial correction by merely *making noises of contract interpretation*" or by "dress[ing] his policy desires up in contract interpretation clothing." *Anheuser-Busch, Inc. v. Ill., Local Union No. 744*, 280 F.3d 1133, 1138 (7th Cir. 2002) (emphasis in original; citations and quotations omitted).

When an arbitrator resolves issues that the parties' contract did not authorize him to decide, the award must be vacated.  For example, in *Totem*, the Fifth Circuit Court of Appeals (which at that time comprised what is currently the Eleventh

Circuit) vacated an arbitration award that exceeded the panel's authority. 607 F.2d at 650. The panel was appointed to resolve disputes regarding amounts owed under a charter party agreement that was terminated due to excessive repairs and delays. *Id*. The vessel owner did not request damages for "charter hire," the amount the charterer agreed to pay to use the vessel. *Id*. Nevertheless, the arbitration panel awarded charter hire damages. In so doing, the "arbitration panel exceeded its powers by awarding damages for charter hire" fees that were not at issue in the arbitration. *Id.* at 651 (reversing district court and vacating award).

Similarly, in *Bruno's, Inc. v. United Food & Com. Workers Int'l Union, Local 1657*, 858 F.2d 1529, 1532–33 (11th Cir. 1988), the Eleventh Circuit affirmed vacatur of an award that crafted a new employee-discipline policy. The parties' collective bargaining agreement authorized the arbitrator to determine the validity of employment policies. *Id*. at 1532. But instead of simply declaring the employer's policy invalid, the arbitrator went further and outlined a new policy the parties should follow. *Id*. at 1531–32. The Eleventh Circuit explained that, although arbitrators have broad powers to shape remedies, that power is not "unfettered" and an arbitrator exceeds his authority when he awards a remedy that is outside the scope of the parties' agreement. *Id*. at 1531.

Likewise, in *187 Concourse Associates v. Fishman*, the Second Circuit affirmed vacatur of an arbitration award where, after finding that an employer had

just cause to terminate an employee, the arbitrator fashioned his own remedy to reinstate the employee.  399 F.3d 524, 527 (2d Cir. 2005).  The arbitrator's powers were limited to the questions presented for arbitration, which permitted the arbitrator to fashion appropriate relief only if the employee was not terminated for just cause. *Id*.  Thus, "[u]pon a finding of just cause, there was nothing further to be done." *Id.*

Here, the arbitrator exceeded his powers under the 2013 Agreement when he found Catamaran liable for an alleged breach of the entirely separate 2005 Health Trans Contract.  The arbitrator's authority under the 2013 Agreement extended only to disputes "arising out of or in connection with this [2013] Agreement," which explicitly cautioned that "[t]he arbitrator shall have no right to . . . vary or ignore the terms of this Agreement."  ECF No. 11-2 at § 10.6.3.

Having found that the NBBI claims could not come under the 2013 Agreement, "there was nothing further to be done." *See 187 Concourse*, 399 F.3d at 527. Nevertheless, the arbitrator found that the 2005 Health Trans Contract sprang back to life once the 2013 Agreement was terminated and somehow became an enforceable contract again. *See* ECF No. 11-1 at 27.  He then granted himself authority to make an award of damages pursuant to the 2005 Health Trans Contract and found that UNA was "entitled" to payment at the rate of $███ per NBBI claim under that Contract, for a total of almost $31 million. *Id*.  This Award has no basis in the 2013 Agreement.  Moreover, the 2005 Health Trans Contract (which does not

include an arbitration clause, *see* ECF No. 11-4 at § XV(I)) governed claims submitted to Catamaran from UNA, not from NBBI, and did not include a provision allowing the importation of newly created card programs, further demonstrating the impropriety of the Award.

The Award is a paradigmatic example of impermissible rough justice. The arbitrator observed that neither UNA nor NBBI had been paid for the NBBI claims, that Catamaran had "made revenue" on those claims, and so "one or the other (UNA or NBBI) is due payment."[7] ECF No. 11-1 at 26. That is exactly the type of "industrial justice" award, unmoored from the contract at issue and from which the arbitrator derived his authority, that must be vacated. *Bruno's*, 858 F.2d at 1531.

The arbitrator was free to find that the NBBI claims did not fall under the 2013 Agreement, but he was not at liberty to find a breach of, and award damages under, a completely separate agreement not before him for that purpose. Because that is what he did, the portion of the Award granting UNA relief in connection with the NBBI claims must be vacated. *See Anheuser-Busch*, 280 F.3d at 1143 ("[C]ourts have no choice but to refuse enforcement of the award when the award fails to draw its essence from the . . . agreement.") (internal quotations omitted).

---

[7] Catamaran maintains that NBBI is not entitled to commissions on these claims—and Catamaran thus withheld payment—because NBBI breached its exclusive agreement with Catamaran.

### 3.    Catamaran Was Denied an Opportunity to Be Heard on The Theory of Liability Under The 2005 Health Trans Contract.

Section 10(a)(3) of the FAA also empowers this Court to vacate an award where the arbitrator's misconduct prejudices the rights of a party. Although arbitrators "enjoy wide latitude in conducting an arbitration hearing," "any efficiency in the arbitral process is constrained by the arbitrators' obligation to provide each party a fundamentally fair hearing." *Battles*, 2016 WL 1258597 at \*4–5. A "fundamentally fair hearing" requires, for example, adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator. *Id.* at \*5. It also requires that an arbitrator "'give each of the parties to the dispute an adequate opportunity to present its evidence and argument.'" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chanda*, No. 07-80648-CIV, 2008 WL 11406040, at \*2 (S.D. Fla. Feb. 11, 2008) (quoting *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 18 (2d Cir. 1997)). That includes affording the parties an opportunity to address any new theories of liability or damages not previously addressed in the pleadings. *See, e.g.*, *Selective Ins. Co. of Se. v. William P. White Racing Stables, Inc.*, 718 Fed. App'x 864, 869 n.3 (11th Cir. 2017); *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1128 (Fla. 1985). *Accord Cofinco, Inc. v. Bakrie & Bros., N. V.*, 395 F. Supp. 613, 615–16 (S.D.N.Y. 1975) (vacating arbitration award and holding that when arbitrators decide matters outside their scope, they exceed their authority and also deprive the parties of their right to a fair hearing).

23

For example, in *Talel Corp. v. Shimonovitch*, the Florida District Court of Appeals, applying the Florida analog to Section 10 of the FAA, ordered the trial court to vacate an award because the arbitrator deprived the defendants of an opportunity to respond to plaintiffs' claims for unliquidated damages either orally or in writing. 84 So. 3d 1192, 1194 (Fla. Dist. Ct. App. 2012). As stated by that court, "the arbitrator failed to provide the defaulted defendants with *any* hearing on unliquidated damages, much less a 'fundamentally fair' hearing"—that decision violated the "defaulting party['s] . . . due process entitlement to notice and an opportunity to be heard" and required vacatur of the award. *Id.*

Here, UNA never once argued that if Catamaran refused to recognize and pay NBBI's claims under the 2013 Agreement, then the 2005 Health Trans Agreement would somehow spring back to life and govern NBBI's discount card claims such that Catamaran would owe UNA $▮ per NBBI claim. *See generally* ECF Nos. 11-3, 11-5–11-9, 11-11. Indeed, UNA filed a Motion for Interim Relief in July 2017 in which it argued that, if it lost on the issue of the validity of the 2013 Agreement applying to NBBI's discount card claims, then Catamaran should be obligated to pay $▮ per claim to NBBI pursuant to a 2012 amended agreement between Catamaran and NBBI that would remain in effect after Catamaran refused to recognize the "acquisition" of NBBI's discount card program by UNA. ECF No. 11-8 at 2. Before issuing his Award, the arbitrator likewise never raised the theory that the 2005

Health Trans Contract required Catamaran to pay UNA $██ for each NBBI claim.

As a result, Catamaran never had a chance to assert defenses based on the 2005 Health Trans Contract, nor to challenge its validity as applied to the NBBI claims.  The arbitrator's decision to adopt this new theory without input from the parties deprived the parties of a fundamentally fair hearing and therefore amounted to misconduct under the FAA.  Accordingly, the Award should be vacated.

## **RELIEF REQUESTED**

Petitioners respectfully request that this Court grant this Amended Petition to Vacate the arbitration Award because it was procured by fraud to the extent the arbitrator found in favor of and awarded damages to UNA, or, alternatively, partially vacate the arbitration Award to the extent it purports to order Petitioners to pay UNA damages under the 2005 Health Trans Contract, and grant Petitioners such other and further relief as the Court deems just and proper.

Dated: December 15, 2023

|  |  |
|---|---|
|  | /s/ Erica Conklin Baines |
| Michael Holecek | Erica Conklin Baines |
| Florida Bar No. 1035950 | Florida Bar No. 58121 |
| GIBSON, DUNN & CRUTCHER LLP | HUSCH BLACKWELL LLP |
| 333 South Grand Avenue | 120 South Riverside Plaza, Suite 2200 |
| Los Angeles, CA 90071-3197 | Chicago, IL 60606 |
| Tel:   (213) 229-7018 | Tel:   (312) 526-1551 |
| MHolecek@gibsondunn.com | Erica.Baines@huschblackwell.com |
|  | **Lead Counsel** |

*Counsel for Petitioners OptumRx PBM*
*of Illinois, Inc. and OptumRx, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2023, I electronically filed a copy of the

foregoing with the Clerk of Courts by using the CM/ECF system which will send a

notice of electronic filing to all counsel of record, and by causing an unredacted copy

of the foregoing to be sent via email to all counsel of record.

 /s/ Erica Conklin Baines
Erica Conklin Baines