**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

OPTUMRX PBM OF ILLINOIS, INC., and OPTUMRX, INC.,

Petitioners,

v. Case No. 3:23-cv-1308-TJC-PDB

UNITED NETWORKS OF AMERICA, INC.,

Respondent.

---

**FINAL ORDER**

This case continues a decade-long dispute over unpaid commissions for pharmacy claims and other payments under a 2013 contract. It reached this Court after a seven-year arbitration, which resulted in an award of more than $48 million to Respondent. After the arbitrator announced the award, the saga continued due to the production of new evidence from a related action in Colorado federal court, and a series of subsequent attorney withdrawals, raising the issue of whether the arbitration award had been procured by fraud.

On March 18, 2026, the Court held an extensive hearing on Petitioners' Second Amended Petition to Vacate [the] Arbitration Award (Doc. 85) and Respondent's Opposition and Second Amended Cross-Motion for Confirmation of the Entire Award or, in the Alternative, Partial Vacatur and Other Relief (Doc. 87),

the transcript of which is incorporated herein by reference. (Doc. 102). After careful review, the Court is now prepared to rule.

**I. Background**

Petitioners OptumRx PBM of Illinois, Inc. and OptumRx, Inc., calling their business "Catamaran," provide pharmacy benefit management (PBM) and recordkeeping services to third party payors and health plan sponsors. (Doc. 85 at 6). Respondent United Networks of America, Inc. (UNA), a "value-added healthcare products and services" provider, administers and markets prescription drug discount card programs directly to consumers. (Id.; Doc. 87 at 5).[1] When they were in business together, the parties' agreement provided for commission payments from Catamaran to UNA when customers used a UNA discount card to obtain discounted prescription drugs from a participating pharmacy in Catamaran's network. (Doc. 85 at 6–7). In other words, prescription drug claims were received and processed by Catamaran, Catamaran collected revenue from the claims, and Catamaran compensated UNA a per-claim rate from that revenue if the customer presented a UNA discount card. (Doc. 87 at 6). Non-party National Benefit Builders, Inc. (NBBI) also administers a discount card program. (Doc. 85 at 7).

[1] Petitioner OptumRx PBM of Illinois, Inc. is a Delaware corporation with its principal place of business in Minnesota. (Doc. 3 at 1). Petitioner OptumRx, Inc. is a California corporation with its principal place of business in California. (Id. at 2). Respondent UNA is a Louisiana corporation with its principal place of business in Louisiana. (Doc. 12 at 2).

NBBI is UNA's competitor, but the two companies collaborate in business dealings. (Id.).

Before this, UNA had entered into two different contracts with Catamaran's PBM predecessors or affiliates. (Doc. 87 at 6). The first was an agreement originally signed in 2005 with an entity called Health Trans (Doc. 85-5); the second was an agreement with a PBM called Restat, LLC. (Doc. 55-5).

**A. Catamaran and UNA Enter Their 2013 Agreement**

On December 10, 2013, Catamaran and UNA signed an agreement under which Catamaran would pay UNA a $4.40 commission each time a customer submitted a qualifying claim using UNA's discount card. (Doc. 85 at 7). This rate represented a 10–50% increase over rates in the parties' earlier contracts. (Id.). Critically, the parties agreed to extend this $4.40 claim rate to new discount card programs UNA created or acquired while the 2013 Agreement was in effect. (Id.; Doc. 87 at 6–7; Doc. 11-2 at 7, 25).

The Catamaran/UNA 2013 Agreement contained additional terms. It required Catamaran to pay UNA an "Early Renewal Credit," which was a one-time fee of $2,135,000, "payable within 60 calendar days of the execution of [the] Agreement." (Doc. 87 at 7, 19). Moreover, § 1.12 provided: "Commissionable Claims include all claims in which Catamaran receives payment of any kind[.]" (Doc. 11-2

at 4).[2] If Catamaran did not meet its payment obligations, it was required to pay "a late payment fee of one and a half percent (1.5%) per month interest, or the highest lawful rate allowed, whichever is less, on any past due amount until such amount is paid." (Id. at 25).

**B. UNA Purportedly Acquires NBBI's Book of Business**

On December 18, 2013, UNA CEO Ryan Jumonville emailed Catamaran principal Michael Oshins that "[e]ffective December 17, 2013, UNA reached a deal with NBBI to acquire all of NBBI's Rx business." (Doc. 85-29 at 2). Under the Catamaran/UNA 2013 Agreement signed eight days earlier, this would entitle UNA to the more favorable rate of $4.40/claim for NBBI claims moving forward. Before this, NBBI had an existing contract with Catamaran under which Catamaran paid NBBI $2.25/claim. (Doc. 85 at 7). Catamaran argues that UNA earning the $4.40 rate on NBBI claims would create a "windfall" of more than $10 million per year for UNA and NBBI, which they intended to share. (Id. at 8).[3]

That same day, Oshins responded to Jumonville stating, "[c]ongratulations and best wishes. I look forward to seeing where this combined entity can go." (Doc. 85-29 at 2). UNA and NBBI then sent a joint email requesting that Bank

[2] The parties dispute the meaning of this provision. See infra note 7.

[3] "NBBI generated around 400,000 commissionable claims per month, and so the increased payout from applying UNA's rate would be $10.3 million per year ($2.15 x 400,000/month)." (Doc. 85 at 8 n.2).

Identification Numbers (BINs) be transferred to UNA. (Doc. 87 at 8). However, Catamaran soon became "[s]uspicious of the timing" because UNA purportedly acquired a major competitor, NBBI, just eight days after signing the Catamaran/UNA 2013 Agreement. (Doc. 85 at 2). On January 7, 2014, claiming it had lost trust in UNA, Catamaran sent UNA a letter terminating the Catamaran/UNA 2013 Agreement, effective March 8, 2014, which was permitted under that agreement. (Id. at 8).[4] On January 8, 2014, Oshins sent Jumonville an email stating, "I know we will get to a mutually beneficial solution quickly and am in the process of making my internal 'pitch[.]'" (Doc. 87 at 9). On January 10, 2014, Oshins sent "proposed improvements to the current agreement" to Jumonville. (Doc. 86-1 at 30). However, the Catamaran/UNA 2013 Agreement was not reinstated.

Six months later, on July 16, 2014, Oshins emailed Jumonville stating that Catamaran's legal department requested to see the UNA/NBBI "[a]cquisition agreement, appropriately redacted." (Doc. 85-69 at 5). That same day, 45 minutes after receiving the email from Oshins, UNA Chief Legal Officer Bob Davies

[4] Section 7.3(c) of the Catamaran/UNA 2013 Agreement allowed either party to terminate by giving the other party "60 days written notice." (Doc. 11-2 at 14). At the hearing, Catamaran clarified that the termination of the agreement did not immediately cease all payments because of a run-out period, or "tail," in the agreement. (Doc. 102 at 16–17). While there has been no new business between the parties since the agreement was terminated, there have been payments since the termination that have "diminish[ed] over time." (Id.).

downloaded from LawDepot.com a "Purchase of Business Agreement" template. (Doc. 85-22 at 17). Catamaran argued in the arbitration that "the template document is virtually identical to the agreement UNA later produced to Catamaran[.]" (Id.). "The obvious conclusion is that Davies downloaded the template, made modifications to it, then sent it to be signed by NBBI." (Id. at 18).

Two days later, Jumonville responded to Oshins, attaching the first and last page of the purported Purchase Agreement (the "UNA/NBBI PA"), signed by Jumonville and NBBI principal Ray Marszalowicz, and dated December 17, 2013. (Doc. 85-69 at 5). Notably, under the UNA/NBBI PA, UNA did not acquire NBBI as an entity but acquired specific NBBI "programs and plans" processed under certain BINs. (Doc. 87 at 8).[5] Before this exchange between Jumonville and Oshins, UNA had not produced any timestamped evidence that the UNA/NBBI PA existed, although it was not required to do so under the Catamaran/UNA 2013 Agreement. (Docs. 85-22 at 17; 11-1 at 22).

UNA explains the lack of timestamped evidence that the UNA/NBBI PA was executed on December 17, 2013 as follows:

> . . . UNA tendered a unilateral "**take-it-or-leave-it**" offer to NBBI. This offer was memorialized in the physical PA, which Ryan Jumonville generated using an online template, and transmitted via Next-day air courier. NBBI subsequently executed the PA on December 17, 2013, and returned signed copies of the PA. As a result of this

[5] UNA argues that "[a]fter the acquisition, NBBI still existed as an independent entity, and, in fact, acted as a broker for UNA's discount drug card." (Doc. 87 at 31).

> method of transmittal, there exists no contemporaneous record of email correspondence or digital negotiation exchanges concerning the PA during the relevant timeframe.

(Doc. 87 at 7–8) (emphasis in original) (citations omitted).

Things were relatively silent between the parties after July 18, 2014, when Jumonville sent Oshins the heavily-redacted version of the UNA/NBBI PA. On February 1, 2015, the parties' agreement having been terminated almost a year earlier, UNA moved its "Big Book" from Catamaran to another PBM called ProCare. (Doc. 85-21 at 167).

**C. The Arbitration (2016–2023)**

The quiet was short-lived. On May 25, 2016, UNA commenced arbitration against Catamaran for its "refusal to (i) pay UNA fees on Commissionable Claims where [Catamaran] collected PBM Revenue; (ii) pay UNA the per-Claim fee; and (iii) price Claims under the favorable terms of the [Catamaran/UNA] 2013 Agreement, including and especially claims under NBBI's acquired Asset." (Doc. 87 at 10). UNA also sought relief under the Early Renewal Credit and late payment provisions. (Id.).[6] Catamaran responded that the Catamaran/UNA 2013 Agreement was void "because UNA fraudulently induced Catamaran to sign [it,]"

[6] The Catamaran/UNA 2013 Agreement also contained a cap on the fees paid to pharmacies for filling prescriptions (the "Dispensing Fee Cap") to protect UNA's commissions. (Doc. 11-2 at 23). UNA argued in the arbitration that the cap was exceeded, resulting in money owed to UNA. (Doc. 85-21 at 112). The arbitrator accepted this argument and awarded UNA more than $6 million for this claim. (Doc. 11-1 at 31).

and argued UNA did not provide sufficient proof that it validly acquired NBBI. (Doc. 85 at 9). UNA sought damages of nearly $350 million,[7] while Catamaran argued UNA should recover nothing. (Doc. 11-1 at 39).

What began as a "relatively straight-forward breach of contract claim" in the arbitration soon became "far more complex," requiring a "huge data review and discovery process." (Id. at 16). The arbitrator oversaw what he felt was "perhaps the most extensive discovery process undertaken in an arbitration." (Id. at 3). On November 21, 2016, Catamaran served its initial discovery requests on UNA, including a request for all UNA communications with NBBI related to their business relationship. (Doc. 85-69 at 7). On February 10, 2017, UNA "finally produced a full [unredacted] copy of its alleged contract to acquire NBBI, dated December 17, 2013." (Id.; Doc. 85 at 10).

Catamaran then moved to compel production of UNA's correspondence with NBBI and other documents concerning NBBI's discount card claims from June 2013 to 2020. (Doc. 85 at 10). UNA "denied that it ha[d] any documents requested . . . that it has not disclosed[,]" and the arbitrator ordered UNA to "make a good faith

[7] A significant portion of UNA's $350 million claim for damages was tied to § 1.12 of the Catamaran/UNA 2013 Agreement. (Doc. 85-21 at 90–91). In UNA's view, this provision entitled it to a fee on all claims where Catamaran made PBM revenue, including those reported as paid at the "Usual and Customary" (U&C) price of the pharmacy. (Docs. 87 at 17; 11-1 at 33). (See also Doc. 85-21 at 90) (arguing that UNA proved Catamaran's liability under § 1.12's "you get paid, we get paid" language). In the arbitration, Catamaran argued that it never intended UNA be paid on U&C claims. (Doc. 11-1 at 33).

effort to obtain" all responsive documents from NBBI. (Id.). Importantly, Catamaran also subpoenaed NBBI for its correspondence with UNA and copies of the UNA/NBBI PA. (Id.). NBBI produced "some" responsive emails and documents, but like UNA's, its production "included no emails showing their negotiations, or containing drafts of the alleged acquisition agreement or any other UNA-NBBI agreement." (Id.). It was not until after the arbitration, when Catamaran sued NBBI in Colorado, that NBBI revealed additional relevant documents for the first time in 2024–25. (Doc. 85-69 at 2).

In the arbitration, principals for Catamaran and UNA testified and responded to interrogatories. For instance, to explain the way the UNA/NBBI PA was executed, Jumonville testified that he's "an old-school guy" who "do[es]n't keep electronic copies," and NBBI's executives are "not the kind of people that e-mail and use technology." (Doc. 85 at 11).[8] Jumonville also testified that NBBI's Marszalowicz signed the UNA/NBBI PA while on his July 2014 honeymoon. (Docs. 85 at 11; 85-22 at 19). Catamaran argues that this testimony by Jumonville, given just weeks before the arbitration Final Hearing, was the first evidence of UNA's fraud because it suggests the UNA/NBBI PA was not signed in December 2013, but

[8] Catamaran underscores that "UNA's counsel doubled down on Jumonville's claim, asserting 'UNA . . . does not pursue and consummate acquisitions in the same heavily papered manner as a public company,' and UNA 'complied' with Catamaran's discovery requests because 'UNA ha[d] already produced its responsive communications with NBBI' from December 2013 to July 2014." (Doc. 85 at 12).

rather in July 2014. (Doc. 85 at 11). Catamaran subsequently obtained a 3-month continuance of the hearing and "expended enormous resources" to find the truth, but argues that UNA "ran out the clock" on Catamaran's efforts. (Id.).

As expected, UNA's perspective is quite different. UNA argues that Catamaran failed to take advantage of discovery in the arbitration because: (1) after Catamaran subpoenaed NBBI, "[Catamaran] did not communicate directly with NBBI, formally or informally, to request any additional discovery or information that may have led to the production of the [relevant facts]"; and (2) in July 2020, the arbitrator entered an order entitling Catamaran to commence a separate action in court "for the specific purpose of obtaining discovery from NBBI, and further provided that the Hearing would not occur until [Catamaran's] discovery action was completed." (Doc. 87 at 13). Therefore, UNA contends, "[d]espite expressly being given the opportunity [to follow up with or sue NBBI] before the binding final Hearing, [Catamaran] refused to do so." (Id.) (emphasis omitted). UNA contends that Catamaran instead "forecasted a pre-meditated strategy to collaterally attack the Award via a separate action in court against NBBI" in Colorado. (Id. at 14).

In February 2023, Catamaran filed an Emergency Motion with the arbitrator, resulting in a consent order allowing Catamaran to adjourn the June 2023 Final Hearing if it could show "severe prejudice." (Id.). In April 2023, Catamaran submitted its argument that it was "severely prejudiced" due to missing

emails, but also argued that the "Final Hearing Date Cannot be Postponed," opting to move for sanctions instead of a continuance. (Id.). The four motions for sanctions were ultimately denied. (Id.).

Beginning on June 12, 2023, the arbitrator held the Final Hearing, which lasted six days. (Doc. 11-1 at 3). UNA's Jumonville testified at the Final Hearing that there was no doubt in his mind that the UNA/NBBI PA was signed in December 2013. (Doc. 85-19 at 174–75); (Id. at 41) (referring to December 17, 2013: "That's the date that the purchase agreement was fully executed."). The parties then filed post-hearing briefs, rebuttals, supporting documents, and proposed awards. (Doc. 11-1 at 3). The arbitration record officially closed on September 6, 2023. (Id.).

**D. The Arbitrator's Award**

On October 5, 2023, the arbitrator issued his 39-page award, ordering Catamaran to pay UNA a total of $48,362,033. (Doc. 11-1 at 38, 40). Specifically, he granted UNA's claim regarding the Early Renewal Credit and awarded the full amount ($2,135,000) plus substantial late payment fees ($9,178,438), for a total award of $11,313,438 on this claim; he granted UNA's claim that it purchased the NBBI Book and was entitled to payment and awarded UNA $30,999,892, without imposition of late payment fees; and he granted UNA's claim regarding whether

Catamaran violated the Dispensing Fee Cap[9] and awarded $6,048,703, without late fees. (Id. at 37–38). He ordered Catamaran to pay the sums due to UNA within thirty days, after which the balance would be subject to late fees of 1.5% per month until paid. (Id. at 38–39). The arbitrator declined to award attorneys' fees or costs to either side because, "[w]hen viewed in the context of Claims vs. Awards, neither Party can be said to have 'prevailed' within the meaning [of] the term[.]" (Id. at 39).

Before discussing the merits, the arbitrator ruled on several outstanding motions made by the parties. He granted UNA's motion for an adverse inference with respect to Catamaran's refusal to produce "Network Revenue" information, after Catamaran was ordered to do so. (Id. at 11; Doc. 87 at 16). At the same time, the arbitrator declined to extend UNA an adverse inference regarding the non-appearance of Greg Buscetto, a former Catamaran employee who allegedly negotiated the Catamaran/UNA 2013 Agreement with Jumonville, finding that "there is no evidence that Buscetto was under Catamaran's control at the time of the requested participation, and thus there was no breach of the alleged duty [to produce him]." (Doc. 11-1 at 12).

The arbitrator then outlined the nine questions underlying the dispute and answered each in turn. He first found that there was a valid agreement between Catamaran and UNA, despite Catamaran's argument that it was void because

---

9 See supra note 6.

Catamaran was fraudulently induced to contract with UNA. (Id. at 18). He reasoned that the testimony suggested Catamaran wanted UNA's business and made concessions it had not made in agreements with other companies—both paying UNA a high claim rate and, importantly, allowing UNA "to expand its Book and thus increase its revenue, without any requirement that Catamaran approve the transactions." (Id. at 19).[10] Neither party was more sophisticated than the other, and the deal was negotiated "at arms-length by two industry-leading companies," so the arbitrator found the parties intended "that the terms state what they state and mean what they mean." (Id. at 19–20).

Second, he found that because their agreement was valid, UNA was entitled to the Early Renewal Credit. (Id. at 20). There were no conditions on the payment of this fee other than the execution of the agreement. (Id.). Thus, "UNA qualified for the payment just by signing" the Catamaran/UNA 2013 Agreement, and Catamaran's refusal to pay it was a breach thereof. (Id.). He awarded UNA over $9 million in late fees because Catamaran did not have a good-faith argument against

[10] The arbitrator elaborated: "The much discussed 'Section 2,' provisions would have and did allow UNA to buy any plan, any company, their assets, or their accounts and thus bring them under the payment terms afforded to UNA. This provision, and many others in the Agreement, were negotiated over a period of time by the Parties, were not a surprise to Catamaran, and should have been expected by Catamaran to result in UNA buying other accounts, assets, or companies to expand its Book. The fact that it did so, or appeared to do so, immediately after the Agreement was commenced may have been a shock to Catamaran, but it was not fraud, and it was within the terms specifically agreed to by the Parties." (Doc. 11-1 at 19).

paying the fee, Catamaran could have paid it any time from December 2013 to the June 2023 Final Hearing, UNA did not cause the delay in payment, and the terms of the late payment were well-defined in the agreement. (Id. at 20–21).

Third, the arbitrator considered the crux of the dispute: whether UNA validly purchased the NBBI Book. (Id.). He first observed that "[i]f UNA had produced the NBBI Agreement [in or around December 2013], there is no question that they would be entitled to receive the $4.40 per claim that UNA had negotiated for its Book as of December 10, 2013." (Id.). But because UNA had not done so, "we must look to the actions and statements of the Parties to inform us" as to what happened. (Id. at 23).

As noted, a few months into the arbitration, UNA finally produced the complete UNA/NBBI PA, asserting that it was signed in December 2013, while Catamaran argued it was not signed until at least July 2014. (Id.). Catamaran asserted that UNA deliberately backdated the UNA/NBBI PA and tried to use it to sustain the argument that it was signed in December 2013. (Id. at 24). On this point, the arbitrator stated unequivocally: "If [Catamaran's assertion is] true, then UNA committed fraud, as generally understood, and should not benefit from the 'back-dating' of the document." (Id.) (emphasis added). UNA disputed that it had backdated any documents, but could not produce copies of the UNA/NBBI PA it relied upon, allowing Catamaran to make the argument. (Id.). UNA thus did not "definitively prove" it acquired NBBI's business in December 2013, and there was

"at least a credible question of fact[]" regarding the UNA/NBBI PA. (Id. at 23, 27).

Because of this doubt surrounding the UNA/NBBI PA, the arbitrator assessed other evidence of a purchase of the NBBI Book by UNA. He noted that Louisiana law, as asserted by UNA, "would suggest that no written agreement is required to make effective the legal sale of an asset such as the NBBI Book." (Id. at 25). For example, he examined Jumonville's testimony about how he shared the news of the sale to Catamaran, emails indicating the communications to/from NBBI would now be directed to him/UNA, and stated that these actions were "entirely consistent with an owner (UNA) of a property (the NBBI Book) acting to take control of and direct the management of the property." (Id.). However, Catamaran argued that "the same actions are also consistent with what they termed a 'Network Agreement' which would allow UNA to 'borrow' the NBBI Book . . . ." (Id.). The arbitrator stated, again unequivocally: "If this assertion [by Catamaran] is true, then no purchase of the NBBI Book ever occurred and thus UNA would not be entitled to bill for the NBBI [claims] under the enhanced UNA rates because it did not fit within the meaning of the UNA Section 2 rights." (Id.) (emphasis added).

This brought the arbitrator to the "key question"—when did UNA acquire NBBI? (Id. at 26). He stated that "[t]he Parties agree that UNA owns or controls the NBBI Book now, and owned or controlled the NBBI Book when UNA moved the

UNA Big Book and the NBBI Book to another PBM . . . ,"[11] but asked, "when did UNA own/control the NBBI Book in 2013–2014?" (Id.). He wrote that "we cannot tell when, prior to moving the NBBI Book to another PBM, that UNA owned the NBBI Book" but concluded that "[s]ince NBBI did not protest or try to prevent the move away from Catamaran, UNA owned the NBBI at least by the time it was moved." (Id.) (emphasis added). However, there was "not sufficient evidence to conclude that the purchase/sale of the NBBI [Book] was made in time to bring it under the Agreement and allow it to be billed at the UNA rates [of $4.40/claim], before the Agreement was terminated by Catamaran [in 2014]." (Id.) (emphasis omitted). Instead, the arbitrator found that "UNA, as the owner of the NBBI Claims at least by January 2015, and likely at least by July 2014, is entitled to be paid for [the outstanding claims]." (Id. at 28) (emphasis added). He concluded that "[b]ecause we cannot establish the ownership with certainty prior to January 2015, we will award UNA only the payment for the NBBI Legacy Claims processed after January 1, 2015[.]" (Id.). Having found UNA acquired the NBBI Book by conduct by January 2015, the arbitrator next determined what rate to pay on the nearly 8 million outstanding claims submitted by UNA and NBBI. (Id. at 27) ("From January 1, 2014, up to and including September 30, 2023, NBBI claims were submitted either directly by NBBI, or by UNA. To date, we understand that no

[11] At the March 18, 2026 hearing, Catamaran contended that it never agreed with these statements. (Doc. 102 at 61).

payments have been made to either NBBI or UNA for some of these claims. Catamaran processed these claims and made revenue, and one or the other (UNA or NBBI) is due payment.").[12]

He reasoned that because Catamaran terminated the Catamaran/UNA 2013 Agreement in January 2014, after that point in time, the underlying 2005 HealthTrans contract between the parties remained in place. (Id. at 27–28).[13] This contract provided for a $4.00/claim rate, slightly lower than the $4.40/claim rate UNA sought. (Id. at 27). Accordingly, the arbitrator awarded UNA payment for NBBI claims processed after January 1, 2015, at the historical rate of $4.00/claim. (Id. at 28). The award for these outstanding claims was calculated as follows: "7,749,973 claims x $4.00 per claim (Health Trans rate) for a total of $30,999,892." (Id.). The arbitrator declined to add late payment fees to this amount. (Id.). Also in UNA's favor, he found that Catamaran exceeded the Dispensing Fee Cap of $6.15, based on testimony from two experts who agreed Catamaran exceeded the cap by at least $6,048,703, and awarded UNA this amount, without late fees. (Id. at 31).

---

[12] See supra note 4 (explaining why claims were still being submitted after the Catamaran/UNA 2013 Agreement was terminated).

[13] The arbitrator explained: "The terms of the Agreement between UNA and Catamaran specifically superseded the Prescription Discount Card Program Administration Agreement between UNA and Restat, LLC, but did not supersede the Agreement with Health Trans. Whether this was oversight, or intentional, it results in the Health Trans Agreement being enforceable as to the claims once the [Catamaran/UNA 2013 Agreement] was terminated." (Doc. 11-1 at 28) (emphasis added).

And he denied Catamaran's counterclaim of tortious interference with its client NBBI, in part because NBBI did not protest or take other action to block the move away from Catamaran to another PBM, which would have indicated otherwise. (Id. at 29).

UNA did not prevail in all respects, however. The arbitrator denied UNA's claim for damages from attrition. (Id. at 31). And he denied UNA's § 1.12 Usual and Customary (U&C) spreading claim, because similar terms in previous contracts between the parties did not allow UNA to be paid for such claims. (Id. at 37) ("In this case, 'any' and 'all' refer only to what they have always referred to: those claims that occurred when a sale was made to a Couponholder ('Member') using one of the formulae in Ex. A of the Agreement, which does not include claims classified as U&C, even if Catamaran received payment.").

**E. The Colorado Action: Catamaran v. NBBI**

On November 15, 2023, Catamaran sued NBBI and its principals in the United States District Court for the District of Colorado. (Doc. 87 at 21). Catamaran argues that discovery in the Colorado case "quickly exposed UNA's and NBBI's fraud" because it uncovered an initial set of about 30 undisclosed documents in the custody of Justin Alpert, NBBI's outside counsel in the mid-2010s. (Docs. 85 at 15; 91 at 3).

Catamaran moved in the Colorado action to pierce the attorney-client privilege under the crime-fraud exception with respect to the Alpert file. (Doc. 85

at 16). United States Magistrate Judge Reid Neureiter granted the motion to pierce the attorney-client privilege after a hearing and an in-camera review of the Alpert file. OptumRx PBM of Ill., Inc. v. Nat'l Benefit Builders, Inc., No. 1:23-cv-3020-NYW-NRN, 2024 WL 4504562, at *1, *8 (D. Colo. Oct. 16, 2024). Judge Neureiter found that "there is probable cause to believe that Mr. Alpert was retained for the purpose of drafting documents that would be used to execute a plan inconsistent with what had been represented to [Catamaran] and in furtherance of a fraud." Id. at *8. Judge Neureiter also wrote that "the backdating issue [regarding the UNA/NBBI PA] appears to be almost a given," and "it appears that Mr. Alpert was enlisted to paper a transaction that differed in material respects from what was represented to [Catamaran] at that time." Id. at *7–8 (emphasis added). He ordered NBBI to produce the unredacted Alpert file to Catamaran within five days. Id. at *8.[14]

In response to this ruling and Catamaran's further discovery requests, NBBI continued to produce "hundreds of documents and emails exchanged with UNA that were concealed in the arbitration[,]" many of which UNA's Jumonville and Davies either sent or received. (Doc. 85 at 15–16). Catamaran argues that this shows UNA

[14] Judge Neureiter also stated "there is nothing particularly earthshaking in the redacted portions of the Alpert File, at least in the mind of this Court[,]" but "there may be specifics that would jump out to an advocate more schooled in the specifics of the business and the history between these parties." 2024 WL 4504562 at *8 (emphasis added).

principals "falsely testified in the arbitration that all relevant documents had been produced, and that UNA acquired NBBI in December 2013[.]" (Id. at 15).

On September 12, 2025, about a year after Judge Neureiter's ruling, United States District Judge Nina Wang granted in part and denied in part NBBI's Motion for Partial Dismissal, largely on jurisdictional and pleading standard grounds. OptumRx PBM of Ill., Inc. v. Nat'l Benefit Builders, Inc., No. 1:23-cv-3020-NYW-NRN, 2025 WL 2636574, at *18 (D. Colo. Sep. 12, 2025). As of this writing, the Colorado action is still in discovery.

**F. The Instant Case: Catamaran v. UNA**

On November 3, 2023, about a month after the arbitration award issued, Catamaran petitioned this Court to vacate it. (Docs. 1, 53). The case was stayed for several months, beginning in April 2024, because—spurred by the Colorado action—counsel for UNA produced documents to Catamaran that they received from counsel for NBBI. (Docs. 56 at 1; 57). Among the new documents were emails between UNA and NBBI about their business relationship, such as correspondence regarding draft agreements that post-dated the UNA/NBBI PA and were inconsistent with UNA having purchased NBBI's book of business. (Doc. 85 at 15). UNA did not produce these documents during the arbitration. (Id.). At the March 18, 2026 hearing, when asked why these documents were not produced, UNA stated that it is a small business that "didn't have a network" or "IT professionals the way, perhaps, that [Catamaran] does" and its principals simply did not have the missing

documents and emails. (Doc. 102 at 41) ("UNA didn't have them. They produced what they had.").[15]

In May 2024, shortly after Catamaran received the initial set of new documents, UNA's attorneys from the firm Calcagni & Kanefsky LLP moved to withdraw from this case, which was opposed by Catamaran. (Docs. 58, 61, 62, 65). Magistrate Judge Barksdale ultimately granted their motion, finding that they satisfied the requirements for withdrawal and Catamaran's opposition overlapped with, or otherwise came too close to, the merits of the case. (Doc. 70).[16] The Court extended the stay to allow the parties to mediate the dispute but the parties impassed. (Docs. 71, 73). The Court then lifted the stay and reopened the case.

On June 9, 2025, Catamaran filed its Second Amended Petition to Vacate [the] Arbitration Award, with 71 attachments and a version filed under seal. (Docs. 84, 85). UNA filed its Opposition and Second Amended Cross-Motion for Confirmation of the Entire Award or, in the Alternative, Partial Vacatur and Other Relief (Docs. 86, 87), and Catamaran replied. (Doc. 88). Catamaran moved to

---

[15] At the hearing, Catamaran added that UNA's "witnesses and the head of the company collect[ed] their own e-mails" to be produced, rather than UNA's lawyers handling discovery and production of documents. (Doc. 102 at 64). Catamaran argued that UNA principals cherrypicked the emails and documents to be produced in the arbitration. (Id.).

[16] Judge Barksdale cautioned the withdrawing attorneys that "[t]he Court retains jurisdiction over the lawyers to adjudicate any Rule 11 or similar motion without expressing any opinion on the merits of such a motion." (Doc. 70 at 3).

supplement the evidentiary record in support of its Second Amended Petition with the deposition of Justin Alpert, and UNA responded. (Docs. 90, 91, 99).

## II. Initial Matter

Catamaran's filing is denominated a petition to vacate, rather than a motion to vacate, which runs contrary to the Federal Arbitration Act ("FAA"). See O.R. Secs., Inc. v. Pro. Plan. Assocs., Inc., 857 F.2d 742, 745 (11th Cir. 1988) ("The policy behind [FAA] section 6 is to expedite judicial treatment of matters pertaining to arbitration. The statutes and rules do not permit a party to initiate a challenge to an arbitration award by filing a complaint or an Application to Vacate Arbitration Award. It is clear that such a request for relief shall be made in the form of a motion as provided in Fed. R. Civ. P. 7(b).") (quotation modified). Accordingly, the Court will construe Catamaran's petition as a motion to vacate the arbitration award. Id. at 746 ("The liberality of the . . . Federal Rules is such that an erroneous nomenclature does not prevent the court from recognizing the true nature of a motion.") (citation omitted); see also Who's Your Daddy, Inc. v. Sacks Motor Sports, Inc., No. 6:07-cv-862-JA-DAB, 2008 WL 11435645, at *2 (M.D. Fla. May 23, 2008) ("[A]lthough WYDI has filed a 'Petition,' it is construed as a motion in keeping with the requirements and policy of the [FAA].") (footnote omitted).

## III. Analysis

The FAA "imposes a heavy presumption in favor of confirming arbitration awards." Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1288 (11th Cir. 2002) (citing

Gianelli Money Purchase Plan & Tr. v. ADM Inv. Servs., Inc., 146 F.3d 1309, 1312 (11th Cir. 1998)). However, the statute provides that a court "may," in its discretion, vacate an award if it was "procured by corruption, fraud, or undue means[.]" 9 U.S.C. § 10(a)(1). The party requesting vacatur bears the burden to prove one of the statutory grounds. Riccard, 307 F.3d at 1289.[17]

To prevail on its motion to vacate the arbitration award because of fraud under § 10(a)(1), Catamaran must satisfy the three-part test outlined in Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378 (11th Cir. 1988). First, Catamaran "must establish the fraud by clear and convincing evidence." Id. at 1383. Second, the fraud "must not have been discoverable upon the exercise of due diligence [by Catamaran] prior to or during the arbitration." Id. Third, Catamaran "must demonstrate that the fraud materially related to an issue in the arbitration." Id. The Court discusses each in turn.

**A. Whether There Is Clear and Convincing Evidence of Fraud**

Although the FAA does not define "fraud," case law confirms that perjury and fraudulent concealment are viable theories of fraud in this context. See id. at 1383 n.7 ("There is no doubt that perjury constitutes fraud within the meaning of the

[17] Courts may also vacate an award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced," 9 U.S.C. § 10(a)(3); or "where the arbitrators exceeded their powers . . . ," id. § 10(a)(4).

Arbitration Act.") (citations omitted); NuVasive, Inc. v. Absolute Med., LLC, 642 F. Supp. 3d 1320, 1333 (M.D. Fla. 2022) ("Lying under oath is just the type of fraud envisioned by the provision of the FAA allowing for vacat[ur] of an arbitration award."), aff'd, 71 F.4th 861, 877–79 (11th Cir. 2023); France v. Bernstein, 43 F.4th 367, 378 (3d Cir. 2022) ("[A]t least for purposes of § 10(a)(1) of the FAA, knowingly concealing evidence is analogous to perjured testimony.") (quotation modified).

Fraud warranting vacatur of an arbitration award can be demonstrated by a "timeline" allowing for "side-by-side comparison" of what was known at arbitration and the alleged fraud. NuVasive, 71 F.4th at 878. "Clear and convincing evidence is evidence that produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." Cincinnati Ins. Co. v. Quorum Mgmt. Corp., 186 F. Supp. 3d 1307, 1326 (M.D. Fla. 2016) (quotation omitted).[18]

Catamaran argues that UNA defrauded "the arbitrator and arbitration proceeding itself" by concealing documents and offering false testimony for two main purposes: to cover up the alleged scheme to backdate the UNA/NBBI PA, and to hide a separate Network Access Agreement between UNA and NBBI (which

[18] The FAA and Eleventh Circuit cases do not define "clear and convincing" in this context. This definition has roots in Slomowitz v. Walker, 429 So. 2d 797, 799–800 (Fla. 4th DCA 1983), a case about service of process, not vacatur of an arbitration award. However, this definition tracks the traditional meaning of "clear and convincing" and is therefore apt in this context as well.

would make it less likely that UNA ever acquired NBBI). (Doc. 85 at 18–28).[19] As evidence of the alleged backdating scheme, Catamaran relies in large part on an email from UNA's Jumonville to NBBI principals, dated December 17, 2013. (Id. at 19). This date is significant because it was the day before Jumonville informed Catamaran's Oshins of the purported acquisition. (Id.). The email begins to pull back the curtain on UNA's and NBBI's communication during this time. Jumonville wrote to NBBI, with a subject line of "Acquisition" and an importance designation of "High":

> This is my proposed story to Catamaran.
>
> **Effective December 17, 2013, UNA reached a deal with NBBI to acquire all of NBBI's Rx business. As part of this deal NBBI has been retained to manage this business for a period of five (5) years.**
>
> I don't think we need to provide any additional details. I plan on asking them to transition the current biz to our contract effective Jan 1, 2014. How does this sound to you gents?

(Doc. 85-25 at 2) (emphasis in original). After NBBI responded that this proposed story "sounds fine to us[,]" Jumonville replied, "10-4, I will break the news to them now gents." (Id.). Jumonville sent this "story" to Catamaran's Oshins, word for word, the next day. (Doc. 85-29 at 2). Jumonville then forwarded Oshins'

[19] The parties have submitted a deluge of documents in support of their positions. The Court has reviewed the extensive record, and discusses herein only the most relevant and probative documents filed. For example, the Court omits discussion of the BIN number and rebate disputes.

congratulatory response to NBBI, with the message: "I spoke to him on the phone and he has no problems. I'm sure he will reach out to congratulate you gents." (Id.). Notably, this email chain was not produced in the arbitration. (Doc. 85 at 19).

Catamaran argues that the acquisition was indeed "just a story—in reality, NBBI continued to own its discount card program." (Doc. 85 at 8). Catamaran contends that UNA and NBBI were instead still negotiating a Memorandum of Understanding and a Network Access agreement in 2014 (discussed further below). (Id. at 19, 21). Catamaran also argues that Jumonville lied under oath at the arbitration Final Hearing when he stated that the UNA/NBBI PA was fully executed on December 17, 2013. (Id. at 20) (citing Doc. 85-19 at 41) (Jumonville referring to December 17, 2013: "That's the date that the purchase agreement was fully executed.").

Catamaran contends this statement cannot be true for several reasons. For instance, Catamaran points to certain 2016 NBBI emails not produced in the arbitration sent by NBBI's Marszalowicz. (Id. at 21, 25). The emails concerned an insurance underwriter's request "for a copy of [NBBI's] contract from [its] biggest clients," including UNA. (Id. at 21). Marszalowicz wrote to his staff: "We dont have one from una i dont think. . . . We did not sign a contract with una." (Doc. 85-60 at 2) (emphasis added). He later confirmed to his staff: "We do not have an UNA agreement as far as I know. Never have. So ask [the NBBI CEO] what we should say." (Doc. 85-41 at 2) (emphasis added). Thereafter, Marszalowicz wrote to the

NBBI CEO: "What do you [recommend] we say to the[m] about the lack of a contract with UNA." (Doc. 85-61 at 2). Marszalowicz then said to the underwriter: "We do not have a contract with UNA for receipt of these funds. UNA provides PBM network access and claim processing receipts from use of our discount free Rx Drug cards and pays us accordingly." (Doc. 85-62 at 2).

During arbitration, Jumonville forwarded Catamaran's initial discovery requests to NBBI, stating "Gents, I will call you on these later today"—even though NBBI was not a party to the arbitration. (Doc. 85-49 at 2). And, beginning on the day Catamaran requested that the arbitrator execute a subpoena to NBBI, UNA and NBBI exchanged 27 phone calls over a seven-week period, all while UNA represented that "no documents are being withheld." (Doc. 85-69 at 7). Jumonville later testified that he spoke to NBBI's Marszalowicz just "once or twice in the last four or five years or so, you know, so not much communication." (Id. at 8). However, "[r]ecords in the Colorado litigation show Jumonville and Marszalowicz in fact exchanged 36 phone calls in the four years [preceding] the deposition" and "also exchanged dozens of emails in the same period." (Id.).[20]

---

[20] The new documents also show that UNA and NBBI were putting their wheels in motion before Catamaran/UNA 2013 Agreement was even signed. For example, NBBI reviewed the Catamaran/UNA 2013 Agreement—to which it was not a party—in detail in November 2013, before it was signed in December 2013. (Doc. 85-57 at 3–4) ("We looked at the following language in your proposed Catamaran agreement . . . but we have the following questions . . . . As far as your intent here, how does it relate to bundling our claims with yours with respect to transportability, rebates, ownership, control if we sell our company, and other

Catamaran also submitted substantial evidence that UNA hid a separate Memorandum of Understanding (MOU) and Network Access Agreement (NAA) between UNA and NBBI, drafted after the purported UNA/NBBI PA was executed. As noted, such documents make it less likely that UNA ever acquired NBBI. (Doc. 85 at 22) (". . . UNA and NBBI were negotiating and acted consistently with a Network Access Agreement that purportedly gave NBBI 'access' to UNA's better rates with Catamaran. Absent an acquisition, however, UNA had no right to grant such access to NBBI."). On December 30, 2013, about two weeks after UNA purportedly acquired NBBI's business or assets, Alpert sent NBBI a revised draft of the MOU, stating: "Keep in mind that this is an MOU, and we are still going to need to move to definitive documentation that is acceptable to both sides." (Doc. 85-69 at 4). That same day, NBBI emailed the draft MOU to UNA for review, stating: "Once the MOU is executed we can move to formalize a contract." (Id.). This conduct is inconsistent with what Jumonville told Catamaran—that UNA had acquired NBBI's Rx business. Why would UNA and NBBI need an MOU if an acquisition had already taken place?

Then there is the NAA, drafted by Alpert in April 2014, which never references an acquisition; it states that NBBI "shall own all of its [c]laims." (Doc.

---

related issues?") (emphasis added); (see also Doc. 85-69 at 2, right-hand column) (summarizing UNA and NBBI contact before the Catamaran/UNA 2013 Agreement was signed, not produced in the arbitration).

85 at 23). UNA and NBBI "continued to revise and negotiate this document throughout the summer of 2014." (Id.). In June 2014, UNA's Davies emailed the draft NAA to NBBI, stating: "Once you get new cards out to the members . . . you can send them anywhere you want, and we will assist in that transaction." (Doc. 85-69 at 5). This meant that if UNA's and NBBI's relationship ended, UNA would assist NBBI in moving its business elsewhere—a strange offer if UNA truly already owned NBBI's business or assets. Other emails show that the terms of the NAA controlled UNA's and NBBI's relationship.

UNA contends that it never signed or agreed to either the MOU or NAA, which is why no signed versions were produced in the arbitration. (Doc. 87 at 27, 32). But even if no signed versions were ever produced, why would UNA and NBBI go through the effort and expense to negotiate these documents, which are entirely inconsistent with UNA having already acquired NBBI's business?[21] NBBI even hired outside counsel to draft the documents, which were revised over several months. And if these draft agreements were so innocuous, with no legal effect, why were they not produced in the arbitration? See Eletson Holdings, Inc. v. Levona Holdings, Ltd., No. 1:23-cv-7331-LJL, 2026 WL 84510, at *39 (S.D.N.Y. Jan. 12,

[21] UNA's explanation for the NAA is that NBBI was attempting to "retrade the PA or introduce a new agreement with different terms"—which, in their view—"does not negate the existence of the PA." (Doc. 87 at 32). Again, this argument is unconvincing. The NAA clearly states that NBBI "shall own all of its [c]laims"—language inconsistent with the "story" that UNA had acquired NBBI's claims. (Doc. 85 at 23, 25).

2026) (". . . Eletson continued to discuss internally the terms under which it could acquire the Preferred Interests, communications that would be nonsensical if those interests had already been acquired.").

UNA's other defenses and explanations are similarly unavailing. For instance, Jumonville's statements that that he's "an old-school guy" who "do[es]n't keep electronic copies," and NBBI's executives are "not the kind of people that e-mail and use technology" are no longer credible, given the many emails between UNA and NBBI that have been produced since. (Doc. 85 at 11); <u>see</u> <u>Eletson</u>, 2026 WL 84510 at *53 (explaining that new documents, which were not disclosed in the arbitration, "directly refute the story Eletson told at the arbitration. These documents, which go to the core of the dispute in the arbitration, <u>frequently were sent or received by the former principals of the company themselves and thus demonstrate the knowing falsity of their testimony</u>.") (emphasis added).

UNA attempts to flip the script by arguing that Catamaran concealed evidence in the arbitration regarding two main issues: the Network Revenue data and the non-appearance of Catamaran's Buscetto. (Doc. 87 at 44). To be sure, Catamaran was not perfectly forthcoming in the arbitration either. But likening UNA's misconduct in the arbitration to Catamaran's would create a false equivalency. Indeed, after a close inspection of the record, the Court finds UNA's arguments about Catamaran's nondisclosures without merit. First, the arbitrator knew Catamaran failed to disclose its Network Revenue data and granted UNA an

adverse inference on that point. (Doc. 11-1 at 11). Second, regardless of whether Buscetto was never actually asked to testify or refused to testify,[22] the arbitrator stated that participation in the proceeding was voluntary and he "lack[ed] the power of a Court of Law to compel a witness to attend[.]" (Id. at 12). UNA's contention that its U&C spreading claim would have been granted if Buscetto had testified in the arbitration is too speculative. In short, Catamaran's nondisclosures were before the arbitrator and were ruled on accordingly; UNA's were not known until after the award issued. Moreover, unlike Catamaran's actions, UNA's misconduct was egregious and went to the heart of the arbitration.

The weight of the evidence points clearly and convincingly to fraudulent conduct by UNA. Catamaran's timeline of key events, attached to this opinion as Exhibit 1, separated by what was known at arbitration versus what was not, is a persuasive demonstrative, in line with what the Eleventh Circuit endorsed in NuVasive, 71 F.4th at 878. The timeline shows not only that UNA withheld documents and lied in the arbitration. (Doc. 85-69, right-hand column) (depicting what was withheld in the arbitration); (id. at 6) (noting that UNA's Davies falsely stated in October 2017 that "no documents are being withheld"); (id. at 8)

[22] UNA now argues that it has since received documents not available in the arbitration suggesting Catamaran misled the arbitrator to believe Buscetto had refused to testify. (Doc. 87 at 44). Catamaran responds that it did not mislead the arbitrator because it told the arbitrator that it never asked Buscetto to testify. (Doc. 88 at 10).

(explaining Jumonville's false 2021 deposition testimony about the date the UNA/NBBI was signed, how it was signed, and the nature of UNA's and NBBI's communications). It also shows the broader picture of fraud—that UNA and NBBI collaborated to deceive Catamaran that UNA had acquired NBBI's business or assets and therefore was entitled to UNA's $4.40 claim rate on NBBI claims. And it conveys how after the alleged acquisition took place, UNA and NBBI were still negotiating and drafting other agreements (the MOU and the NAA), under which NBBI would own its claims—entirely inconsistent with what they had represented to Catamaran.

The timeline and the record as a whole produce "a firm belief or conviction, without hesitancy," that UNA had not actually acquired NBBI's business or assets when UNA said it did. Cincinnati Ins. Co., 186 F. Supp. 3d at 1326. As the arbitrator found, this means that "UNA committed fraud . . . and should not benefit from the 'back-dating' of the document." (Doc. 11-1 at 24). Thus, Catamaran has presented clear and convincing evidence that UNA's "story" was a lie and the "award was procured by . . . fraud." 9 U.S.C. § 10(a)(1).[23] The Court therefore proceeds with the Bonar analysis.

[23] The Court reaches this conclusion without consideration of the Alpert deposition, which was taken as part of discovery in the Colorado action (after Catamaran filed its Second Amended Petition here). (Doc. 85). While the deposition is supportive of Catamaran's position, the Court declines to consider it in an abundance of caution and in accordance with the mandate that courts reviewing arbitration awards undertake "expeditious and summary hearing, with only

**B. Whether the Fraud Was Discoverable with Catamaran's Due Diligence in the Arbitration**

The second part of the Bonar test provides that "the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration." 835 F.2d at 1383. "Reasonable diligence does not require parties to assume the other side is lying." France, 43 F.4th at 380 (holding that a petitioner's decision not to seek court enforcement of subpoenas directed at non-parties did not amount to a lack of reasonable diligence).

Catamaran argues that UNA's fraud was not discoverable in the arbitration because Catamaran "repeatedly requested UNA and NBBI's emails and negotiation history," but was "thwarted" by UNA "falsely claim[ing] it complied with that request and insist[ing] additional documents did not exist." (Doc. 85 at 28). UNA responds that Catamaran "had ample time and opportunity to discover many of the emails involving NBBI that it now proffers as evidence of fraud, of which it did not take advantage." (Doc. 87 at 34). Citing O.R. Securities, UNA states that "where a party had the opportunity to notice and cross-examine on alleged perjured testimony at an arbitration proceeding, the alleged fraud was discoverable during the arbitration." (Id. at n.11).

---

restricted inquiry into factual issues." O.R. Secs., 857 F.2d at 748 (citation omitted). Thus, Catamaran's Motion to Supplement [the] Evidentiary Record in Support of [the] Second Amended Petition to Vacate (Doc. 91) is due to be denied as moot.

In O.R. Securities, a company sued to vacate an arbitration award against it for the payment of financial services commissions. 857 F.2d at 744. The company argued that an individual testified falsely in the arbitration to the detriment of the company's case. Id. at 748. The Eleventh Circuit held that the false testimony "was or should have been noticed by [the company]" during the arbitration, the company "had the opportunity to cross-examine on the alleged false testimony," and therefore "the alleged fraud was discoverable during the arbitration proceedings." Id. at 749. However, in comparing the dispute in O.R. Securities with the facts of Bonar, the Eleventh Circuit wrote in a footnote:

> Unlike the "incorrect" testimony allegedly offered in the present case, the false nature of the testimony in Bonar was not readily apparent. There, a witness completely falsified his credentials so as to be designated an expert. The opposing party was unable to investigate the witness' credentials prior to the arbitration proceeding because the rules of the American Arbitration Association do not provide for a prior exchange of witness lists. . . . Thus, the fraud [in Bonar] was not discoverable prior to or during the arbitration process.

Id. at n.7 (emphasis added).

Similar to Bonar, UNA's fraud was "not readily apparent" in the arbitration because UNA withheld hundreds of documents that would have proven it and also gave false testimony in the arbitration. Although Catamaran suspected UNA's fraud based on the circumstances of the purported acquisition and limited information available about UNA's and NBBI's relationship, Catamaran was prevented from being able to prove it. See also Eletson, 2026 WL 84510 at *61

("Levona did not know if fraud had occurred because it had not seen the documents at issue. . . . Eletson had prevented Levona from acquiring that information[.]"); NuVasive, 71 F.4th at 879 n.11 ("[G]iven that, before testifying, Hawley took an oath affirming that there was no one in the room with him and no one was communicating with him, it was reasonable for NuVasive to believe, in reliance on this oath, that no one was coaching him."); (Doc. 85 at 28–29) ("Catamaran had no credible basis to claim that NBBI was concealing a draft MOU and [NAA] because of UNA's misrepresentations, concealed evidence, and perjury denying any such agreements existed."). UNA's arguments miss this point.

In the arbitration, Catamaran repeatedly demanded UNA produce "UNA and NBBI's emails and negotiation history," moved to compel production of UNA's correspondence with NBBI and other documents concerning NBBI's discount card claims from June 2013 to 2020, and subpoenaed NBBI for same. (Doc. 85 at 10, 28). Catamaran also "asked to delay the hearing and sought more discovery, sanctions and an adverse inference, but UNA continued to misrepresent that no additional evidence existed." (Id. at 28–29). Despite these efforts by Catamaran, UNA now contends that Catamaran could have done more to uncover its fraud. (Doc. 87 at 34–35). For instance, UNA argues Catamaran could have followed up with NBBI after the arbitrator issued the subpoena, or Catamaran could have taken the arbitrator's offer to delay the June 2023 Final Hearing while it initiated a lawsuit against NBBI to enforce the subpoena. (Id.). But these arguments are disingenuous

because UNA was the one who could, and should, have done more—by simply producing the documents that were requested in the arbitration, as UNA was required to do. France, 43 F.4th at 380 ("It piles one unfairness on another to say that Bernstein had to seek enforcement of the subpoenas shortly before an arbitration hearing, just to double-check whether France was being truthful[.] . . . Bernstein could have reasonably concluded it was not worthwhile to aggressively pursue non-party discovery, especially considering the cost and burden involved in instituting an action in federal court, as necessary to enforce those subpoenas.").

UNA's arguments also misapprehend the applicable legal standard. Catamaran was not required to do everything possible to uncover the alleged fraud; it was required to exercise due diligence. Catamaran did so in the arbitration by making document requests of UNA, moving to compel production of UNA's correspondence with NBBI, and subpoenaing NBBI for its correspondence with UNA. (Doc. 85 at 9–10); see France, 43 F.4th at 380 (holding that Bernstein "did in fact take substantial measures toward uncovering France's perjury[,]" including requesting the relevant documents from France and asking the arbitrator to authorize subpoenas directed at non-parties); id. at 381 ("It is true that Bernstein did not pursue every possible discovery mechanism, but a litigant's diligence can be legally adequate even if some stones are left unturned. 'Reasonable' does not mean 'perfect.'"). Catamaran reasonably expected that its demands, motion, and

subpoena would produce the relevant documents. Consequently, Catamaran has satisfied the second part of the Bonar test.

**C. Whether the Fraud Materially Related to an Issue in Arbitration**

Catamaran contends that the concealed evidence was not only material but dispositive to the arbitrator's award. (Doc. 85 at 30). Catamaran also argues that the concealed evidence "directly impacts the arbitrator's findings regarding the parties' 'conduct,'" such as the conclusion he drew from NBBI not trying to "protest" or "prevent" UNA from moving its business from Catamaran to ProCare. (Id.).[24] UNA responds that the alleged fraud by UNA was immaterial to the award, and the arbitrator had all material information before him. (Doc. 87 at 36).

Catamaran has the better of this argument. UNA's fraud is material because it shows that UNA and NBBI coordinated to deceive Catamaran that UNA had acquired NBBI's Rx business. In any event, Catamaran need not show that the arbitrator's award would have been different but-for the fraud. Bonar, 835 F.2d at 1383 (holding that the materiality requirement "does not require the movant to establish that the result of the proceedings would have been different had the fraud

[24] As noted, the arbitrator found an acquisition based on conduct in part "[s]ince NBBI did not protest or try to prevent" UNA from moving its business away from Catamaran. (Doc. 85 at 30). The new evidence, however, shows this was not necessarily because NBBI acquiesced to UNA's control. Rather, it was more like a "business choice that NBBI made as owner of its claims," because Marszalowicz told Jumonville in July 2014 that NBBI was "not in a position to negotiate on our own with a PBM," and "[i]f you change PBMs, we will go with you." (Id. at 30–31).

not occurred."). UNA's fraud was plainly material to, as the arbitrator put it, the "key question" in the arbitration—"when did UNA acquire NBBI?"—because UNA sought to deceive Catamaran and the arbitrator about the answer to that question. (Doc. 85 at 31). As previously noted, the arbitrator stated in the award that if Catamaran's assertion that UNA deliberately backdated the UNA/NBBI PA were true, "then UNA committed fraud, as generally understood, and should not benefit from the 'back-dating' of the document." (Doc. 11-1 at 24). See also France, 43 F.4th at 382 (". . . it is clear that the arbitrator's fact-finding task would have looked much different had Bernstein possessed the concealed evidence to support the core allegation in his grievance.").

**IV. Vacatur and Remedy**

Catamaran has made the required showing under all three parts of the Bonar test, meaning this Court "may" vacate the arbitration award. 9 U.S.C. § 10(a).[25]

"If there is one bedrock rule in the law of arbitration, it is that a federal court can vacate an arbitral award only in exceptional circumstances." Grupo Unidos por el Canal, S.A. v. Autoridad del Canal de Panama, 78 F.4th 1252, 1261 (11th Cir.

---

[25] Because Catamaran has carried its burden of proving the award was procured by fraud, the Court declines to address its arguments regarding § 10(a)(3) and (a)(4), which are separate statutory bases for vacating the award. (Doc. 85 at 16–17) (arguing the arbitrator exceeded the scope of his powers by relying on the 2005 HealthTrans Agreement to award damages; arguing the arbitrator deprived Catamaran of an opportunity to address the 2005 HealthTrans Agreement as a basis for liability).

2023) (citations omitted). This is one such exceptional circumstance. Because of the severity of the fraudulent conduct, because the deception went on for years, and because the fraud was central to the dispute between the parties, the Court finds it appropriate to vacate the arbitration award. The Court must decide whether to vacate the award in full or in part, and whether to direct a rehearing by the arbitrator. See 9 U.S.C. § 10(b).

Catamaran requests that the Court vacate the award in full. (Docs. 85 at 35; 102 at 21–23). Catamaran alternatively requests that the Court partially vacate the award "to the extent it purports to order Petitioners to pay UNA damages under the 2005 Agreement." (Doc. 85 at 35). This alternative request would entail vacating the approximately $31 million award for outstanding discount card claims, but confirming the $17 million award for the Early Renewal Credit (and late fees) and the Dispensing Fee Cap violations. On the other hand, UNA requests the Court confirm the entire award and also award it "all costs of collection," including attorneys' fees. (Doc. 87 at 43). Alternatively, UNA asks the Court to vacate only the arbitrator's denial of its U&C spreading claim "because [Catamaran] fraudulently concealed evidence materially related to the Arbitrator's ruling on that claim." (Id. at 43–44).

The Court denies UNA payment for the $31 million for unpaid claims because, as already explored at length, UNA and NBBI engaged in fraud to secure those commissions. The question is whether to also deny UNA payment for the

remaining $17 million of the award, which resulted from provisions of the Catamaran/UNA 2013 Agreement the arbitrator found were freely negotiated. (Doc. 11-1 at 19). It is true, as the arbitrator noted, that the law "did not impose a duty on UNA to disclose its plans [to acquire other businesses], and thus UNA did not breach any duty to Catamaran" in this regard. (Id.). The arbitrator considered Catamaran's allegation that "UNA committed fraud by not disclosing that it was or may have been in discussion with another company (in this case, NBBI) to purchase that company's accounts, business or otherwise." (Id. at 18). However, he found that "the facts do not support the assertion that Catamaran would not have entered into the Agreement if Catamaran had known about the potential expansion of UNA's book of business." (Id. at 18–19).

That is, even though UNA did not "disclose its plans" with NBBI to Catamaran, the arbitrator found that § 2 of the Catamaran/UNA 2013 Agreement "should have been expected by Catamaran to result in UNA buying other accounts, assets, or companies to expand its Book." (Id. at 19). Fair enough. But UNA's sin was not that it failed to disclose to Catamaran that it was in talks with NBBI before the Catamaran/UNA 2013 Agreement was signed. UNA's transgression was that it initiated the arbitration under false pretenses, then withheld incriminating documents and lied under oath about the nature of UNA's and NBBI's relationship.

In making the award, the arbitrator "look[ed] to the actions and statements of the Parties" to understand what happened. (Doc. 11-1 at 23). We now know that

because of UNA's perjury and concealing of documents, the arbitrator had an incomplete picture of the parties' conduct. UNA's fraud infected the entire arbitration proceeding. Attempting to separate a certain dollar amount of the award untainted by UNA's misconduct would therefore be futile. In any event, § 10 of the FAA does not require courts to undertake such a task. See Sullivan v. Feldman, 132 F.4th 315, 337 (5th Cir. 2025) ("Vacating the whole award may be warranted where the *ultra vires* action "'taint[s] the entire process.'") (quoting PoolRe Ins. Corp. v. Organizational Strategies, Inc., 783 F.3d 256, 265 (5th Cir. 2015)), cert. denied, 146 S. Ct. 1503 (2026); PoolRe, 783 F.3d at 265–66 ("[A] district court does not *have* to vacate in part and confirm in part just because it *may* do so. . . . Nothing in the statute . . . suggests that a district court errs by failing to vacate in part[.]") (emphasis in original).[26]

The arbitrator himself stated that if UNA deliberately backdated the UNA/NBBI PA, "then UNA committed fraud, as generally understood, and should not benefit from" that fraud. (Doc. 11-1 at 24). If UNA's deviousness had been disclosed at the arbitration, the entire tenor of the proceeding would have been altered, and UNA's credibility would have been severely compromised. Permitting UNA to walk away with the hefty payout of $17 million would allow UNA to benefit

[26] Although PoolRe and Sullivan deal with § 10(a)(4)—the FAA provision permitting vacatur of an arbitration award where the arbitrator exceeded his or her powers—the Court finds their general principles regarding remedy applicable and persuasive here.

from its fraud. The Court therefore finds vacatur of the entire arbitration award appropriate.

The Court also declines to direct a rehearing by the arbitrator. It would be unfair to require Catamaran to "go through the time and expense of a new proceeding" at this point in the "years' long" dispute when the failure of the arbitration was attributable to UNA's misconduct. NuVasive, 642 F. Supp. 3d at 1333. In addition, it is unlikely "that a remand to the [arbitrator] could cure the harm from [UNA's] misconduct." NuVasive, 71 F.4th at 880. It would be nigh impossible and extremely costly to try to put the genie back in the bottle and start all over again.

***

"*Things gained through unjust fraud are never secure.*" – Sophocles

Accordingly, it is hereby

**ORDERED:**

1. Petitioners OptumRx PBM of Illinois, Inc.'s and OptumRx, Inc.'s Second Amended Motion to Vacate [the] Arbitration Award (Doc. 85) is **GRANTED**. The arbitration award of $48,362,033.00 (Doc. 11-1), issued on October 5, 2023 to Respondent United Networks of America, Inc., is **VACATED in full**.

2. Respondent United Networks of America, Inc.'s Opposition and Second Amended Cross-Motion for Confirmation of the Entire Award or, in the Alternative, Partial Vacatur and Other Relief (Doc. 87) is **DENIED**.
3. Petitioners OptumRx PBM of Illinois, Inc.'s and OptumRx, Inc.'s Motion to Supplement Evidentiary Record in Support of Second Amended Petition to Vacate (Doc. 91) is **DENIED as moot**.
4. The Clerk shall **enter judgment** in favor of Petitioners OptumRx PBM of Illinois, Inc. and OptumRx, Inc. and against Respondent United Networks of America, Inc., terminate any pending motions and deadlines, and close the file.
5. The Court retains jurisdiction to enforce this Order and related matters.

**DONE AND ORDERED** in Jacksonville, Florida this 17th day of September, 2026.

TIMOTHY J. CORRIGAN
Senior United States District Judge

hms
Copies:

Counsel of record
Exhibit 1 (attached)

**EXHIBIT 1 (Doc. 85-69)**

# DEMONSTRATIVE TIMELINE OF KEY EVENTS

**Evidence Available at Arbitration**

**November 19, 2013 at 5:55 PM CT:** UNA's Jumonville emails NBBI's Barry Forester about software outages. This email plays no material role in the Arbitration.[1] Ex. 63.

**December 10, 2013:** Catamaran and UNA sign the Prescription Discount Coupon Program Administration Agreement (the "2013 Agreement") containing language Jumonville earlier sent to NBBI's Forester. Ex. 3.

**Evidence Unavailable in Arbitration**

These documents were revealed for the first time over the course of 2024 and 2025 through a Colorado lawsuit against NBBI.

**September 23, 2013:** NBBI Executive Vice President Barry Forester emails NBBI CEO Kevin Faherty: "I spoke to Ryan J[umonville] today and he mentioned that he was talking to Greg [Buscetto of Catamaran] with respect to renegotiating his Catamaran contract. With us in mind, he got him to agree, although somewhat reluctantly, to insert language that would enable him to add additional clients even though they might be existing Catamaran customers." Ex. 64.

**November 19, 2013 at 5:57 PM CT (6:57 PM ET):** Two minutes later, under the subject line "Catamaran," Jumonville emails NBBI's Barry Forester about draft contractual language that would allow UNA to bring acquired business under the terms of its new contract with Catamaran. Jumonville adds: "Barry, per our conversation, this is language in Cat agreement. Let me know if you have any suggestions." Ex. 55 at -93–-94.

**November 20, 2013:** After being forwarded Jumonville's November 19, 2013 email, NBBI CFO Raymond Marszalowicz responds to Jumonville, asking, among other things: "As far as your intent here, how does it relate to bundling our claims with yours with respect to transportability, rebates, ownership, control if we sell our company, and other related issues?" Ex. 56 at -74.

[1] Not all emails produced by UNA are reflected in the left-hand column, nor does the right-hand column contain all emails UNA did not produce in the arbitration. Instead, this timeline reflects key events and records and is intended to demonstrate the difference between UNA's presentation of key facts in the arbitration (on the left-hand column) compared to the facts reflected in newly uncovered documents (right-hand column). *See NuVasive, Inc. v. Absolute Med.,* LLC, 71 F.4th 861, 878 (11th Cir. 2023) (holding that fraud warranting vacatur was adequately supported through a "timeline" that allowed for a "side-by-side comparison" between the testimony at issue and the alleged fraud.)

**December 17, 2013:** Jumonville emails NBBI's principals: "**This is my proposed story to Catamaran.**[2]

> Effective December 17, 2013, UNA reached a deal with NBBI to acquire all of NBBI's Rx business. As part of this deal NBBI has been retained to manage this business for a period of five (5) years.

I don't think we need to provide any additional details. I plan on asking them to transition the current biz to our contract effective Jan 1, 2014. How does this sound to you gents?" Ex. 24 at -91.

**December 17, 2013:** NBBI's CEO responds in the same email chain and approves Jumonville's draft "story." Ex. 24 at -91.

**December 18, 2013:** After receiving NBBI's approval, Jumonville emails Catamaran's Michael Oshins the "proposed story to Catamaran" (Ex. 24 at -91):

"Effective December 17, 2013, UNA reached a deal with NBBI to acquire all of NBBI's Rx business. As part of this deal NBBI has been retained to manage this business for a period of five (5) years.

Greetings Michael! We wanted you to be the first to know about this exciting development. I will call you to discuss the plan of action. Regards, RJ." Ex. 28 at -86.

**December 19, 2013:** After forwarding correspondence with UNA, including draft of UNA's agreement with Catamaran and the "proposed story" email, NBBI's Marszalowicz writes to NBBI's transactional attorney Justin Alpert: "I thi[nk] the previous 4 emails are what you need to review. Barry and I will get you a bullet point for NBBI-UNA contracts/concepts tonight." Ex. 57.

**December 20, 2013:** NBBI's transactional attorney Justin Alpert emails NBBI's principals a draft "UNA – NBBI – Binding [MOU] that Ray [Marszalowicz] and I worked up today." Ex. 29.

[2] All emphasis is added unless otherwise indicated.

**December 27, 2013:** UNA's Jumonville requests NBBI's "Group Numbers" so that UNA can ask Catamaran to move NBBI's book of business under UNA's agreement with Catamaran. Ex. 20 ¶ 52.

**December 29, 2013:** NBBI's Marszalowicz emails Jumonville NBBI's "Group Numbers." Ex. 20 ¶ 52.

**December 30, 2013 at 10:07 AM CT (11:07 AM ET):** Alpert distributes to NBBI a revised draft of the "Binding [MOU]" which is "cancellable only by NBBI" and notes: "Keep in mind that this is an MOU, and we are still going to need to move to definitive documentation that is acceptable to both sides." Ex. 30 at -77.

**December 30, 2013 at 3:05 PM:** UNA's Jumonville sends Catamaran NBBI's "Group Numbers" and requests they be moved to UNA's contract with Catamaran, effective January 1, 2014. Ex. 20 at 21.

**December 30, 2013 at 3:15 PM:** NBBI CEO Kevin Faherty emails Jumonville the draft "Binding [MOU]" and writes:

"Ryan,
Attached please find a Memorandum of understanding prepared by our attorney. Please review and let us know if you have any questions.

**Once the MOU is executed we can move to formalize a contract.** I hope you and your family have a happy and fulfilling New Year. We look forward to our new relationship." Ex. 25. *See also* Ex. 67.

**January 15, 2014:** In advance of a meeting with UNA, NBBI CEO Kevin Faherty writes to Jumonville: "We have many things to talk about. I will let you pick the times and we will be ready." Ex. 53.

**April 22, 2014:** Alpert emails NBBI's principals a draft agreement between UNA and NBBI comparing their agreement's terms against UNA's contract with Catamaran. Like the Binding Memorandum of Understanding, this draft agreement provides for NBBI to maintain ownership of its discount card claims and control over NBBI's related programs. Ex. 34.

**April 25, 2014:** Alpert sends NBBI's principals a revised draft agreement between UNA and NBBI titled the "NBBI Retail Processing Agreement_UNA REV (4-25 NBBI)." Ex. 58. **This draft again provides that "NBBI shall own all of its Claims," NBBI is to retain ownership of and control over "its programs" and makes clear that UNA will act as a contractor.** Ex. 7 at -42–43.

**June 11, 2014:** UNA's Davies sends a draft agreement to NBBI's Marszalowicz and assures Marszalowicz that, should UNA and NBBI's relationship end, UNA would assist NBBI in moving its business elsewhere. "**Once you get new cards out to the members with your BIN on them you can send them anywhere you want, and we will assist in that transaction.** As for the legacy BIN claims we would continue to process, we are fine with your taking the rebates with you." Ex. 10.

**July 15, 2014:** Jumonville forwards the draft agreement, the "NBBI Retail Processing Agreement_UNA REV (4-28 NBBI)," to NBBI's Barry Forester. Ex. 36.

**July 16, 2014:** As part of discussions following Jumonville's December 18, 2013 email, Michael Oshins of Catamaran emails Jumonville stating that Catamaran's legal department is requesting to see the purported "[a]cquisition agreement, appropriately redacted" between UNA and NBBI. Ex. 21 at 15.

**July 18, 2014:** Jumonville responds to Catamaran's Michael Oshins' July 16, 2014 email attaching the "first and last" page of some version of the Purchase of Business Agreement signed by Jumonville for UNA and Marszalowicz for NBBI and facially dated December 17, 2013. *See* Ex. 21 at 33–34.

**July 22, 2014:** Marszalowicz instructs NBBI's bookkeeper to make entries in QuickBooks reflecting that NBBI expects payment on its discount card claims, reflecting the terms of the Binding MOU rather than those of the purchase agreement. Ex. 38.

**December 15, 2014:** Jumonville announces to NBBI a "new BIN,"[3] which is "BIN 013824." Ex. 32 at -96–-97. According to Jumonville, this "new BIN" has superior pricing. This "new" BIN had been referenced previously, in the UNA/NBBI agreement that UNA claimed it signed the year before, in December 2013. Ex. 11 at 3.

[3] BIN stands for Banking Identification Number. BINs are routing numbers used to process discount card claims (as well as for other irrelevant purposes).

**January 13, 2015:** Following an email exchange with NBBI's Marszalowicz, Jumonville instructs UNA's Chief Operating Officer to pay NBBI $250,000 for rebates received on NBBI's discount card claims and writes to NBBI "we will simply adjust on next payment." Ex. 52 at -04.

> ***Note***: Language concerning rebates is only found in draft MOU's exchanged by NBBI and UNA. Rebates are not part of any purchase agreement produced in this case so far.

**April 10, 2015:** Jumonville emails NBBI's principals regarding a third rebate payment. The accounting spreadsheet attached to Jumonville's email references NBBI's "50% Due to NBBI" and shows the January 14, 2015 payment of $250,000 as a rebate payment. Ex. 41 at -05.

**May 25, 2016:** UNA files its arbitration demand against Catamaran alleging that UNA acquired NBBI's discount card programs by December 17, 2013. UNA's Davies signs the Arbitration Statement himself. Ex. 5.

**September 29, 2016**: In relation to a request for contracts with UNA from its insurer, NBBI's bookkeeper Jayne Longo emails Marszalowicz that she has no agreement between NBBI and UNA.

Marszalowicz responds nine minutes later**: "We dont have one from una i dont think. . . . We did not sign a contract with UNA."** Ex. 59 at -31.

**September 30, 2016:** NBBI's executive vice president Joanne Filardo emails Marszalowicz: "We do not have access to UNA contract. Shall I send [the broker] NCE and advise you will forward UNA separately?"

**Marszalowicz responds: "We do not have an UNA agreement as far as I know. Never have."** Ex. 40 at -11.

**October 3-4, 2016:** Marszalowicz affirms his position in further emails, stating **"What do you recommend we say to the[m] about the lack of a contract with UNA."** Ex. 60 at -97. He also writes: "**We do not have a contract with UNA for receipt of these funds.** UNA provides PBM network access and claim processing receipts from use of our discount free Rx Drug cards and pays us accordingly." Ex. 61 at -63.

**November 21, 2016:** Catamaran serves its initial discovery requests on UNA, including requests for all communications with NBBI related to their business relationship. Ex. 12.

**December 8, 2016:** Jumonville forwards Catamaran's initial discovery requests to NBBI's principals and writes: "Gents, I will call you on these later today." Ex. 48.

**February 10, 2017:** UNA's Davies emails Catamaran's counsel an unredacted copy of the Purchase of Business Agreement. Ex. 11

**July 27, 2017:** Following UNA's initial document production, Catamaran's counsel writes to UNA's Davies that there are "gaps" in UNA's production of communications between UNA and NBBI and insists that UNA supplement its productions with any unproduced communications with NBBI. Ex. 62 at 2.

**August 15, 2017:** UNA's Davies agrees that UNA will investigate if additional correspondence with NBBI exists and supplement its productions accordingly. Ex. 17 at 1.

**September 14, 2017:** **Catamaran requests that the Arbitrator execute a subpoena to NBBI** with document requests mirroring those earlier sent to UNA. UNA's Davies is copied on Catamaran's counsel's email to the Arbitrator. Ex. 54.

**September 14, 2017 through November 9, 2017:** **Jumonville and Davies exchange 27 phone calls with NBBI's Marszalowicz.** Exs. 49, 51.

**September 15, 2017:** The Arbitrator executes the subpoena to NBBI. Ex. 15. Catamaran serves the subpoena on NBBI the same day.

**October 18, 2017:** UNA makes a supplemental production of correspondence between UNA and NBBI. UNA's Davies certifies "no documents are being withheld." Ex. 26 at 2.

**July 2019 - February 2021:** NBBI produces tens of thousands of pages of documents in response to the subpoena.

> ***Note*: Like UNA, NBBI never produced any of the documents reflected on the right-hand column of this timeline.**

**June 24, 2021:** Jumonville is deposed. He testifies that the Purchase of Business Agreement was signed in December 2013. He further testifies that he has spoken to NBBI's Marszalowicz just "once or twice in the last four or five years or so, you know, so not much communication." Jumonville further attempts to explain the absence of emails around the Purchase of Business Agreement by testifying that all negotiations were by phone and signatures were exchanged by paper mail. Ex. 66 at 90:18–91:20.

> ***Note:*** Records in the Colorado litigation show Jumonville and Marszalowicz in fact exchanged 36 phone calls in the four years proceeding the deposition. Jumonville and Marszalowicz also exchanged dozens of emails in the same period. Exs. 49, 51.

**December 21, 2022:** UNA submits a signed interrogatory answer representing that UNA's payment of $250,000 on January 14, 2015 was a purchase price payment pursuant to the Purchase of Business Agreement. Ex. 13 at 7.

***June 12, 2023: Final Arbitration Hearing Begins***